**AMERICAN HOME ASSURANCE CO., Plaintiff,**

v.

**J. F. SHEA CO., INC. and Washington Metropolitan Area Transit Authority, Defendants.**

Civ. A. No. 77–0706.

United States District Court, District of Columbia.

Feb. 18, 1978.

Richard W. Boone, Washington, D. C., for plaintiff.

John F. Myers, Washington, D. C., for defendant Shea.

Peter J. Ciano, Washington, D. C., for defendant Washington Metropolitan Area Transit Authority.

## MEMORANDUM

GASCH, District Judge.

Plaintiff American Home Assurance Co. filed this suit to obtain a declaratory judgment holding that the claim submitted to it by defendant J. F. Shea Company is not covered by the insurance policy at issue here. Alternatively, if the Court should hold that there is liability under the policy, American seeks a declaration that the amount of liability be reduced by $100,000 pursuant to the deductible provision of the policy. The matter is now before the Court on cross-motions for summary judgment. The parties have submitted a joint stipulation of undisputed facts, the most pertinent of which follow.

Defendant Washington Metropolitan Area Transit Authority (WMATA) obtained an insurance policy from plaintiff to cover construction of its subway system. WMA-TA as well as all its contractors and subcontractors are named insureds under the policy. The insurance protects against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE."[1] Specifically excluded, however, are losses due to "inherent vice," "defective design and specifications," or "faulty workmanship."[2] Also in the insurance contract is a "SUE & LABOR CLAUSE," providing that the insured, when necessary, must sue or labor to safeguard the covered property from actual or imminent loss or to minimize loss once it has occurred and also providing that the insurer will contribute to the expenses incurred by the insured under this clause.[3]

The events precipitating Shea's claim at issue here concerned the construction of a "transition cut"[4] for the subway along its route through Montgomery County, Maryland. An essential part of this work was the construction of a support-of-excavation system to support the terrain along the transition cut during construction of it. Defendant WMATA contracted with defendant Shea to perform this work.

Under the terms of the WMATA-Shea contract, WMATA established the design criteria including the determination of the lateral pressures expected to be imposed on the support-of-excavation system. Pursuant to these criteria, Shea designed and installed the system. There is no contention that Shea's design or workmanship during installation of the system was defective.

The trouble began in late May or early June of 1976 after a major portion of the excavation had been completed and the cut was down to a depth of about fifty feet below the main thoroughfare of Rockville Pike. At that point, inward or lateral movement of the east wall of the support-of-excavation system was detected. Informed of this, Shea investigated and confirmed the movement.

---

1. Complaint Exhibit A at 2.

2. *Id.* at 4–5.

3. *Id.* at 10–11.

4. A transition cut is the point along the subway route at which it changes from an underground to an overland system.

Shea notified the Metro Insurance Administrators of the danger that the support-of-excavation system might collapse with potentially disastrous effects on the insured property in the vicinity as well as on surrounding public and private property, particularly Rockville Pike. Accordingly, Shea expressed its intent to "sue and labor" to defend the system and to present a claim for the cost incurred in that work. WMATA forwarded this notification to plaintiff.

Several letters were then exchanged among the parties, each generally acknowledging the urgency of the matter and the applicability of the sue and labor provision. Shea also periodically submitted cost reports to American. Then, in October, 1976, American wrote Shea advising it that its claim for the repair work was being denied because of faulty workmanship,[5] but also reserving all other defenses available to American.

As earlier noted, American no longer contends faulty workmanship by Shea was involved; rather, it now relies on the exclusions covering inherent vice and defective design. American's theory is that WMATA's design criteria anticipated a certain range of lateral pressures to be exerted on the east wall of the support-of-excavation system. The pressures that in fact occurred were greater than those anticipated, thereby causing excessive deflection in the wall. Accordingly, American submits that WMATA's design criteria were defective. This theory is attractive in its simplicity; yet, its simplicity is also its fallacy.

It is undisputed in this case that WMATA did everything it reasonably could be expected to have done in the preparation of its design criteria. American's own expert, Mr. Nathan Hale, stated that WMATA's estimates of the anticipated lateral pressure were proper and in fact were conservative.[6] Nobody appears to know what caused the wall to bend excessively, and the only theory offered, and the one generally accepted by all, is that of Mr. Hale. In his expert opinion, he could see no reason for the excessive deflection except a possible faulty slippage plane in the earth some distance away from the construction site. Apparently, the earth moved along that plane, forcing the east wall of the support system outward. According to Mr. Hale, it would take a genius to be able to look at the soil borings and determine from them that a slippage plane was present. Expressing it in terms a layman could understand, he stated that if the slippage were in a rock formation, the chances of finding it were one in a hundred, and if the slippage were in the soil, the chances would become a miniscule one in a million.[7]

American has tried to support its argument that the design was defective by invoking the dictionary definition of "defective," which states that something is defective when it is

1. wanting in something, incomplete, lacking a part; deficient, imperfect; faulty

2. in error, at fault . . . ..

Webster's New International Dictionary 584 (1971). In the Court's view, however, such definition equally supports the defendants' position. This definition suggests the involvement of negligence or other improper conduct on the part of the actor. Yet, as noted above, American's expert stated that nothing improper was done by either WMATA or Shea.

5. Reimbursement under the sue and labor clause is only available if the labor was to prevent a loss that the policy would have covered. *Reliance Ins. Co. v. The Yacht Escapade*, 280 F.2d 482, 489 (5th Cir. 1960); *accord, Continental Food Products, Inc. v. Insurance Co. of North America*, 544 F.2d 834, 837 (5th Cir. 1977); *see* 6 J. Appleman, *Insurance Law & Practice* § 3794, at 163 (1972). Thus, if the excessive deflection in the wall is attributable to anything within the policy's exclusionary clauses, no sue and labor compensation is required.

6. After installation, the support-of-excavation system was tested at 140% of estimated pressures, and it held. After the deflection was noticed, it was again tested at 120% of estimated pressure, and it still held.

7. Deposition of Nathan Hale at 34, 53, 54 (Nov. 21, 1977).

■ In construing limitations on liability, they are to be construed as a whole and not by separating one word or phrase from another and focusing only upon it.[8] The entire clause of which "defective design" is a part states that the insurance does not cover

[l]oss or damage caused by defective design and specifications, faulty material, or faulty workmanship, but this exclusion shall apply only to the faulty or defective part or parts.

The logical conclusion after reading this clause is that the purpose is to inform the insured that if its loss results because of something within its control, it will not be covered. This conclusion is reinforced by looking at the other clauses of the exclusionary provision, which appear to exclude from coverage losses attributable to circumstances that are not within the insured's control: e. g., ordinary wear and tear; loss of market; war; and infidelity of an employee.

The defendants have argued, and this Court agrees, that the circumstances of this case simply constitute one of the risks the insurance was to cover. When plaintiff's counsel at oral argument was asked for examples of the kinds of risks included within this "ALL RISK" policy, he responded by saying that coverage was provided for losses caused by some outside force, such as an explosion, earthquake, or falling meteorite, in essence for acts of God.[9] Although loss due to the virtually imperceptible movement of the earth along a slippage plane may not be as spectacular as that resulting from an earthquake or a falling meteorite, the causes are nevertheless similar—outside forces resulting from acts of nature. In this context, WMATA's design criteria were not defective.

■ Although not addressed in its memorandum in support of summary judgment, American has also maintained that it has no liability because of the provision excluding losses caused by "inherent vice." This phrase is not defined in the policy, and when asked by the Court to define it, no party was able to do so, including plaintiff, which drafted the policy. Obviously, in such circumstances and if reasonable, the policy must be construed in favor of the insured defendants.[10]

■ In *Essex House v. St. Paul Fire & Marine Ins. Co.*, 404 F.Supp. 978 (S.D.Ohio 1975), the court was asked to determine whether brick failure in the insured's seven-story apartment building was the result of an "inherent vice," excluding the loss from coverage, when the failure resulted from temperature differentials, coupled with negligence in the design and construction of the building. The court there made reference to a definition from a state court case which stated:

"The term 'inherent vice' as a cause of loss not covered by the policy, does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction. The vice must be inherent in the property for which recovery is sought."

*Id.* at 989 (quoting *Employers Cas. Co. v. Holm*, 393 S.W.2d 363, 367 (Tex.Civ.App. 1965)). After reviewing some other cases involving this same phrase, the court found no inherent vice on the facts before it because the property covered "did not carry within themselves the seeds of their own destruction." That is, the loss was not "brought about by a nonobservable flaw in the insured goods." *Id.* at 991. Because the insured property in the case at bar did not contain its own seeds of destruction but rather was threatened by an outside natural force, the exclusion for inherent vice similarly is not applicable here.

Having concluded that plaintiff is liable under this insurance policy because of the nonapplicability of the two exclusions on

---

8. 1 J. Couch, *Couch on Insurance 2d* § 15:48 (1959).

9. Transcript at 12.

10. 1 J. Couch, *Couch on Insurance 2d* § 15:10, at 658 (1959).

which it relies,[11] and therefore that it must reimburse Shea for its efforts in avoiding a loss, it now becomes necessary to determine whether the $100,000 deductible applies to claims under the sue and labor clause. Apparently this is an issue of first impression. Under the terms of the WMATA–Shea contract, anytime the $100,000 deductible applies to a claim under the policy, Shea will pay the first $10,000 and WMATA is liable for the remaining $90,000.

■ The clause governing deductibles provides in pertinent part:

> All claims as a result of one loss occurrence shall be adjusted as one loss and from each such loss there shall be deducted the amount of $100,000 except as respects loss or damage caused by flood in which event there shall be deducted the amount of $200,000.

Complaint Exhibit A at 3. "Loss occurrence" is defined in the clause immediately thereafter as:

> The terms "loss" or "damage" or "loss occurrence" shall mean an accident, incident, or occurrence or a series of accidents, incidents, or occurrences arising out of one event, condition or disturbance.

*Id.* American contends from these two definitions that the deductible applies to all claims. Before reaching any conclusion, however, it is necessary also to consider the language of the sue and labor clause. It states in pertinent part:

> In case of actual or imminent loss or damage it shall be lawful and necessary for the Insured, their factors, servants or assigns to sue, labor and travel for, in and the defense, safeguard and recovery of the property insured hereunder or any part, thereof, without prejudice to this insurance; to the charges whereof, the Company will contribute according to the rate and quantity of the sum herein insured.

*Id.* at 10–11. This language suggests that sue and labor activities are not "loss occur-

rences," but instead activities taken to minimize or prevent a loss occurrence. Accordingly, a claim under the sue and labor provision is not a claim for a loss occurrence and the deductible by its own definition is not applicable.

This conclusion is consistent with the distinction in the purpose of the policy in general as opposed to the specific purpose of the sue and labor provision. The general all risk coverage is for the benefit of the insured, and as such it is not unreasonable for it to assume some of the responsibility for loss. On the other hand, the sue and labor clause is a separate insurance for the benefit of insurer. A clear pronouncement of this was made in *White Star S.S. Co. v. North British & Mercantile Ins. Co.*, 48 F.Supp. 808 (E.D.Mich.1943), wherein the court stated:

> The law is well settled that the sue and labor clause is a separate insurance and is supplementary to the contract of the underwriter to pay a particular sum in respect to damage sustained by the subject matter of the insurance. Its purpose is to encourage and bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss.

*Id.* at 812–13; *accord, Reliance Ins. Co. v. The Yacht Escapade*, 280 F.2d 482, 488 (5th Cir. 1960); *Home Ins. Co. v. Ciconett*, 179 F.2d 892, 895 (6th Cir. 1950). It is inconsistent to place an affirmative obligation of this nature on the insureds for the benefit of the insurer and then additionally to require the insureds to pay for the first $100,000 of the cost in providing this benefit.

American tries to find support from the language within the sue and labor clause stating "to the charges . . . the Company will contribute according to the rate and quantity of the sum herein insured." American points out that this generally ap-

---

11. Accordingly, it is not necessary to address defendants' alternative argument that plaintiff is estopped from disclaiming liability.

plies when there is more than one underwriter of a particular risk.[12] It then argues that because WMATA has agreed to self-insure for the benefit of Shea all but the first $10,000 of the portion of any loss falling within the deductible clause, it necessarily must follow that WMATA is a contributor as well to the same extent under the sue and labor clause. This is a bootstrap argument at best, however.

A better explanation for this reference to rate and quantity of contribution within the sue and labor clause is that it simply refers back to the clause on limits of liability, which states that the limit is $10,000,000 in any one year including sue and labor charges and that the policy is for 100% of the total contributing insurance.[13] Thus, there is only one underwriter here—American. Shea and WMATA are both named insureds under that policy. Their separate agreement spreading the risk for the deductible, an agreement which mentions the deductible clause only, does not confer any benefit to American. Far more specific language than is present in this policy is necessary to accomplish that result.

Having found on the facts of this case that American is liable to Shea for the expenses it incurred pursuant to the sue and labor clause of the policy, and further that it is liable for the full amount of the expenses appropriately incurred under that clause, the next question concerns the precise amount of that liability. The facts on this issue, however, are disputed. American contends that some of the expenses incurred were for "corrective" rather than "preventive" activities and so were not proper sue and labor expenses. The Court will therefore enter partial summary judgment for defendant Shea on the issue of liability. Defendant WMATA is a party only because of American's contention that the deductible clause pertained to a sue and labor claim. That contention having been rejected, WMATA will be dismissed from the suit. Unless the remaining parties can settle the issue of damages, that matter will be set for trial at the earliest opportunity.

---

**12.** 11 J. Couch, *Couch on Insurance 2d* § 43:138 (1963).

**13.** Complaint Exhibit A at 3.