**GTE CORPORATION, Plaintiff,**

v.

**ALLENDALE MUTUAL INSURANCE COMPANY, Affiliated FM Insurance Company, Allianz Insurance Company, Federal Insurance Company, Industrial Risk Insurers, Defendants.**

No. 99–CV–2877.

United States District Court,
D. New Jersey.

March 26, 2003.

Jeffrey A. Cohen, Robertson, Freilich, Bruno & Cohen, LLC, Newark, NJ, Philip S. Beck, Shawn F. Fagan, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, Robert F. Ruyak, Kenneth N. Hickox, Jr., Howrey Simon Arnold & White LLP, Washington, DC, for GTE Corp.

Henry J. Catenacci, H. Richard Chattman, Gregory D. Miller, Robert J. McGuire, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, NJ, for Allendale Mut. Ins. Co. and Affiliated FM Ins. Co.

Stanley W. Kallmann, Gennet, Kallmann, Antin, & Robinson, Parsippany,

William N. Erickson, Kathleen M. Quinn, Jonathan D. Mutch, Robins Kaplan Miller & Ciresi, Boston, MA, for Allianz Ins Co.

Richard M. Mackowsky, Bernadette Gordon, Cozen & O'Connor, Newark, NJ, for Federal Ins. Co.

Stanley W. Kallmann, Gennet, Kallmann, Antin, & Robinson, Parsippany, Barry R. Ostrager, Mary Kay Vyskocil, Kevin Lewis, Bryce L. Friedman, Simpson Thacher & Bartlett, New York, NY, for Industrial Risk Insurers.

## OPINION

WOLIN, District Judge.

This matter comes before the Court on the motion of defendants Allendale Mutual Insurance Company ("Allendale"), Affiliated FM Insurance Company ("Affiliated"), Allianz Insurance Company ("Allianz"), Federal Insurance Company ("Federal"), and Industrial Risk Insurers ("IRI") (collectively, "defendants"), pursuant to Federal Rule of Civil Procedure 56, for summary judgment on Counts One and Two of the Complaint. Defendant Allendale has also moved for summary judgment on Count Three of the Complaint. Defendant IRI filed a supplemental memorandum of law in support of the motion for summary judgment on the first two counts. Defendant Federal moved for summary judgment on Counts One, Four, Five, Six, and Seven of its Counterclaim. Plaintiff GTE Corporation ("GTE") has cross moved for summary judgment on Phase I issues. The Court has decided these motions upon the written submissions pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth herein, the defendants' motion for summary judgment on Counts One and Two will be granted. Defendant Allendale's motion for summary judgment on Count Three will likewise be granted. The plaintiff's motion will be denied, and

the supplemental motions brought by defendants IRI and Federal will be granted.

## BACKGROUND

With the benefit of hindsight, it is safe to say that the arrival of the year 2000 did not lead to widespread damage or destruction, as many had predicted. The *New York Times* reported on the first day of that new year that "[d]espite a few sputters and glitches, the world's computers appear to have survived the year 2000 rollover without major problems—and with humanity's faith in technology intact, at least for another day."[1] Three years later, it is difficult to recall ever anticipating that worldwide massive computer failures would accompany the new year.

The courts now bear witness to the reality of that fear and to the extensive preparations undertaken to avoid any damage or destruction. The anticipated Year 2000, or Y2K, problem spawned massive litigations throughout the country, and this case is but one example.

## I. Procedural History

GTE filed this declaratory judgment action on or about June 18, 1999, seeking coverage for costs and expenses it incurred remediating its computer systems to avoid year 2000–related date recognition problems. The first count of GTE's complaint sought a declaratory judgment that GTE's costs associated with preventing Y2K-related loss were covered by the sue and labor provisions in the policies, and the second count alleged a breach of contract. The third count sought damages from defendant Allendale for bad faith. Each defendant answered the complaint. Defendant Federal counterclaimed seeking a declaration denying coverage. On August 31, 2000, the U.S. Magistrate Judge entered an order dividing the litigation into phases. In Phase I, the parties were to address whether insurance coverage existed for the plaintiff's claim under any of the first-party property insurance policies named by the plaintiff in the complaint. With some guidance from this Court, the parties proceeded through discovery on the Phase I issues, and on or about October 16, 2002, the parties filed the instant summary judgment motions.

## II. Factual Background

### A. GTE & the Y2K Problem

The Court presumes that its readers have at least a basic understanding of the Year 2000, or Y2K, problem. Seemingly, for many years, computer programmers wrote computer codes using only two digits to specify the calendar year, instead of four digits. When a year was designated as "88," the computer would presume that the first two digits were "19," and it would read the date as "1988." The year 2000, therefore, presented a problem, because computers with time sensitive applications would not be able to recognize that 2000 followed after 1999, and would instead erroneously read the number as 1900. More artfully stated, at the heart of the Y2K problem lay "the inability of computers, software and other equipment utilizing microprocessors to recognize and properly process date fields containing a two-digit year."[2]

At the time this case was filed, GTE was a New York corporation with its principal place of business and corporate headquarters in Irving, Texas. Prior to 1998, GTE was headquartered in Stamford, Connecti-

---

**1.** Steve Lohr, *1/1/00: Technology and 2000— Momentous Relief; Computers Prevail in First Hours of '00*, N.Y. Times, January 1, 2000, at A1.

**2.** Bruce W. Foudree, *The Year 2000 Problem & the Courts*, 9 Kan. J.L. & Pub. Pol'y 515, 516–17 (2000).

cut. At some point after the start of this action, GTE was acquired by Bell Atlantic Corporation, which is now Verizon Communications, Inc.

GTE was one of the world's leading telecommunications providers. According to GTE's 1998 10–K report, the company's revenues for that year amounted to more than $25 billion. Domestically and internationally, GTE and its affiliates provided a variety of telecommunication services, including local telephone, wireless, and internet services. GTE also provided communications and intelligence systems for the military and federal government.

GTE owned and operated a substantial number of computer based systems and networks which generally employed the common practice of using two digits to represent the year. By 1994, GTE had realized that the Y2K rollover presented a sizeable problem. According to GTE, its computer systems faced the threat of significant harm, such as breakdowns from corrupted data or overall system failure. GTE also feared that the loss of functioning computers and accurate data would lead to an interruption in its business operations and its ability to provide essential services to its customers.

GTE responded by developing its own Y2K program to prevent any such damage. By 1994, GTE had begun its Y2K preparations. In December of that year, GTE Service Corporation published "Algorithmic Anarchy: Chaos in the Year 2000" in an internal GTE publication. That report identified the Y2K problem, and discussed the potential impact Y2K would have on GTE's business.

GTE launched its official Y2K program in June 1995. That July, GTE established the corporate level Program Management Office ("PMO") to deal with the Y2K issue. The PMO developed strategies for addressing the Y2K problem and coordinated Y2K efforts among GTE's various business units. A. Gerald Roth, who headed the PMO, stated that the program office's objective "was to assure that whatever operational functionality we had in the company in 1999 we still had in 2000." (Appendix to the Affidavit of Henry J. Catenacci ("Catenacci App.") Vol. 6, Ex. 103, Deposition of A. Gerald Roth at 36:16–36:19.) It was at this time that GTE began drafting its "Criteria for Century Compliance," which was completed in 1996. This report identified the Y2K "challenge," and discussed certain criteria formulated to address the problem.

GTE determined that an extensive amount of its insured property would be affected by Y2K, such as its "computer hardware, equipment, software programs, electronic media, and the extensive data generated, maintained, and stored thereon," including:

multiple deployments of over 900 application systems with roughly 172 million lines of COBOL-equivalent code; the telecommunications elements of GTE's portion of the Public Switched Telephone Network ("PSTN") and the systems that support GTE's network operations and interactions with its customers, consisting of approximately 3,200 clusters of central office or remote switches, approximately 350 clusters of complex network management systems, and approximately 700 clusters of network support systems; countless units of more than 15,000 unique products supplied to GTE by more than 6,000 vendors; 70,000 desktop personal computers and the software, network applications, and hardware that supports them; and more then 400 internal corporate systems, including corporate banking and financial systems, human resource systems, intracompany data networks, electronic commerce interfaces, company inter-

faces, email, facility services, aviation support systems and the GTE intranet. (Catenacci App. Vol. 4, Ex. 69 at 6.) GTE believed that when computer applications began to analyze problematic dates, or what it termed "Event Horizons"[3] (such as January 1, 2000, or February 29, 2000), it would suffer "a loss, including the generation, use, or transmission of corrupted or distorted data, the loss of data, the failure of system operations, and the loss of use, access and/or functionality of such systems." (*Id.* at 9.)

GTE organized its Y2K program into five phases: (1) awareness; (2) assessment; (3) renovation and conversion of affected systems; (4) verification and validation of completed systems; and (5) implementation. According to GTE, its Y2K program was intended to allow "its hardware, firmware and software ... to calculate, compare, sequence and manipulate data with dates before, through and beyond January 1, 2000. As a result of these efforts, GTE's products and systems are expected [to] continue to process date and date-related data without experiencing any substantial decrease or interruption in performance as a result of the century transition." (Appendix to Certification of Shawn F. Fagan ("Fagan App.") Vol. 2, Ex. 18 at 26.)

After GTE's business units identified their systems which might be affected by Y2K, GTE developed Enterprise Plans for each business unit. The business units then developed their own plans for addressing those identified issues. By 1997, GTE had begun the process of converting

and testing any affected products and systems.

Between December 1996 and June 1999, GTE spent an extraordinary amount of money on its Y2K remediation efforts.

## B. The Policies at Issue

For over fifty years, defendant Allendale was the sole provider of property insurance for GTE. In 1996, GTE sought broader coverage, and turned to its broker, Johnson & Higgins Marsh ("J & H"), to procure new coverage. J & H employed a manuscript form, which was included in the marketing submission sent to various insurers, including the defendants. Marsh proposed that the insurers use this manuscript form for the first $50 million layer of coverage. GTE ultimately agreed to a quota share program from a panel of insurers, including the defendants. Affiliated insured 40 percent of $50 million on the primary layer; IRI and XL each insured 20 percent, and Allianz and Federal each insured 10 percent. For the $350 million layer of coverage in excess of $50 million, Allendale insured 40 percent, IRI and XL each insured 20 percent, and Allianz and Ace each insured 10 percent.[4] The manuscript used for the excess layer policies was provided by the carriers. The original term of each policy at issue ran from July 1, 1996 to July 1, 1999, but in 1997, the parties all agreed to extend the policy period to July 1, 2000.

In June 1999, GTE filed a claim with its insurers seeking reimbursement of the costs it incurred for its Y2K program. In a letter dated June 17, 1999, GTE wrote to

---

**3.** In its "Criteria for Century Compliance," GTE explained that system failure or inaccurate processing could occur at an "Event Horizon," which is the point in time "when a computer system begins to process certain types of date and time-related information. An Event Horizon can occur at any time." Ca-

tenacci App. Vol. 2, Ex. 11 at 25; *Id.*, Ex. 18 at 3.

**4.** The XL and Ace polices each contained a mandatory arbitration clause, and therefore, those companies are not defendants in this case.

its insurers that it had incurred, and continues to incur, "costs to avoid or minimize imminent loss to insured property as a result of Year 2000 electronic data and time-recognition matter. These efforts were and continue to be necessary to avoid damage to GTE equipment, magnetic media, and other property as a result of system failures and inaccurate data processing." (Catenacci App. Vol. 4, Ex. 62). GTE filed this suit concurrently.

## C. Coverage

The primary layer policies provide in pertinent part:

*COVERAGE*

Except as hereinafter excluded, this policy covers:

a. *Real and Personal Property*

(1) The interest of the Insured in all real and personal property (including improvements and betterments) owned, used, or under contract to be purchased or leased by the Insured, or hereafter constructed, erected, installed, or acquired including while in the course of construction, erection, installation, and assembly.

. . . . .

b. *Business Interruption—Gross Earnings*

Coverage shall apply under this section unless there is a loss of profits policy in force covering the location where loss is incurred.

(1) Loss resulting from necessary interruption of business conducted by the Insured and caused by loss, damage, or destruction by any of the perils covered herein during the term of

this policy to real and personal property ... not otherwise excluded.... [5]

The primary layer policies further provide:

*PERILS INSURED AGAINST*

This policy insures against all risks of physical loss of or damage to property described herein including general average, salvage, and all other charges on shipments covered hereunder, except as hereinafter excluded.

Physical loss or damage shall include any destruction, distortion or corruption of any computer data, coding, program or software except as hereinafter excluded.[6]

Coverage, then, depends on whether the damaged property is outlined in the "Coverage" section, and whether the property is damaged by a "Peril Insured Against."

The primary layer policies, however, exclude certain perils:

*PERILS EXCLUDED*

This policy does not insure:

. . . . .

c. against the cost of making good defective design or specifications, faulty material, or faulty workmanship. This exclusion shall not apply to loss or damage resulting from such defective design or specifications, faulty material, or faulty workmanship; however any such resulting damage will be subject to all other exclusions in this Policy.

. . . . .

k. against unexplained loss, mysterious disappearance, loss or shortage disclosed on taking inventory, inherent

---

**5.** Affiliated FM Policy No. AE016, Catenacci App. Vol. 1, Ex. 1 at A 12055; IRI Policy No. 31–3–64676, Catenacci App. Vol. 1, Ex. 3 at SIRI 17; Allianz Policy No. 1025660, Catenacci App. Vol. 1, Ex. 4 at ALZ 18; Federal Policy No. 648–22–99, Catenacci App. Vol. 1, Ex. 5 at FED 1518.

**6.** Affiliated, Catenacci App. Vol. 1, Ex. 1 at A 12066; IRI, Catenacci App. Vol. 1, Ex. 3 at SIRI 29; Allianz, Catenacci App. Vol. 1, Ex. 4 at ALZ 30; Federal, Catenacci App. Vol. 1, Ex. 5 at FED 1530.

vice or latent defect unless loss or damage from a peril insured herein ensues and then this policy shall cover for such ensuing loss or damage.[7]

The excess layer policies similarly provide, in pertinent part:

EXCLUSIONS

. . . . .

This Policy does not insure against:

. . . . .

3. faulty workmanship, material, construction or design from any cause; all unless physical damage not excluded by this Policy results, in which event, this Policy will cover only such resulting damage;

. . . . .

5. deterioration, depletion, rust, corrosion, erosion, wear and tear, inherent vice or latent defect, all unless physical damage not excluded by this Policy results, in which event, this Policy shall cover only such resulting damage . . . . [8]

The excess layer policies also contain a "Business Interruption Endorsement," providing, in pertinent part:

In consideration of additional premium, this Policy is extended to cover the Actual Loss Sustained by the Insured during a Period of Interruption directly resulting from physical loss or damage of the type insured against by this Policy, to property not otherwise excluded by this Policy, utilized by the insured and located as described elsewhere in this Policy.[9]

GTE contends that its Y2K-related remediation efforts are covered under the primary policies' Sue and Labor clauses, and the excess layer policies' Preservation and Protection of Property clauses. The Sue and Labor clauses provide, in pertinent part:

In case of actual or imminent loss or damage by a peril insured against, it shall, without prejudice to this insurance, be lawful and necessary for the Insured, their factors, servants or assigns to sue, labor, and travel for, in, and about the defense, the safeguard, and the recovery of the property or any part of the property insured hereunder . . . . [10]

The Preservation and Protection of Property clauses provide, in pertinent part:

In case of actual or imminent physical loss or damage of the type insured against by this Policy, the expenses incurred by the Insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder shall be added to the total physical loss or damage otherwise recoverable under this Policy . . . . [11]

The Court must now determine if an issue of fact remains as to whether GTE's remediation expenses fall within the Sue

---

7. Affiliated, Catenacci App. Vol. 1, Ex. 1 at A 12066–69; IRI, Catenacci App. Vol. 1, Ex. 3 at SIRI 30–32; Allianz, Catenacci App. Vol. 1, Ex. 4 at ALZ 31–33; Federal, Catenacci App. Vol. 1, Ex. 5 at FED 1531–33.

8. Allendale Policy No. CG284, Catenacci App. Vol. 1, Ex. 2 at A 12254–56; IRI Policy, Catenacci App. Vol. 1, Ex. 3, at SIRI 46–48; Allianz Policy, Catenacci App. Vol. 1, Ex. 4, at ALZ 51–53.

9. Allendale, Catenacci App. Vol. 1, Ex. 2 at A 12263; IRI, Catenacci App. Vol. 1, Ex. 3, at SIRI 55; Allianz, Catenacci App. Vol. 1, Ex. 4, at ALZ 60.

10. Affiliated, Catenacci App. Vol. 1, Ex. 1 at A 12079; IRI, Catenacci App. Vol. 1, Ex. 3 at SIRI 42; Allianz, Catenacci App. Vol. 1, Ex. 4 at ALZ 43; Federal, Catenacci App. Vol. 1, Ex. 5 at FED 1543.

11. Allendale, Catenacci App. Vol. 1, Ex. 2 at A 12258; IRI, Catenacci App. Vol. 1, Ex. 3, at SIRI 50; Allianz, Catenacci App. Vol. 1, Ex. 4, at ALZ 55.

and Labor and Preservation of Property clauses.

## DISCUSSION

### I. Standard of Review

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986).

When the non-moving party bears the burden of proof at trial, the moving party can satisfy its burden of production by demonstrating to the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden of showing that there is an absence of a genuine issue of fact, the burden shifts to the non-moving party to "make a sufficient showing on an essential element of [its] case" "to establish a factual dispute." *Id.* at 323, 106 S.Ct. 2548. The non-moving party may not rest on mere allegations, but instead must provide specific facts demonstrating that there is a material dispute. *See id.* at 322 n. 3, 106 S.Ct. 2548, Fed.R.Civ.P. 56(e); *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and moreover, it must demonstrate that sufficient evidence exists from which a jury might return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

Whether a fact is "material" is determined by the substantive law defining the claims. *See id.* at 248, 106 S.Ct. 2505; *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.1989). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment may be granted only if no reasonable trier of fact could find for the non-moving party. *See id.*

Conversely, if a reasonable trier of fact could find for the non-moving party, the court must deny summary judgment. *See id.* In making this determination, the court must draw all reasonable inferences in favor of the non-moving party. *See Nat'l State Bank v. Fed. Reserve Bank of New York*, 979 F.2d 1579, 1581 (3d Cir. 1992); *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982).

### II. The Defendants' Joint Motion

As an initial matter, the Court notes that there has been extensive briefing on the complex issues raised by these motions. While this Opinion will not specifically address each point the parties raise or each case they cite, the parties should rest assured that the Court has considered them.

The Court begins its analysis with the defendants' joint motion for summary judgment on counts one and two of GTE's complaint.[12] GTE's complaint seeks a dec-

---

12. As a federal court sitting in diversity, this Court is bound to apply the substantive law of

laration that the defendants are liable on the policies for sue and labor costs incurred to prevent any damage or destruction caused by the Year 2000 problem. The defendants contend that the policies do not afford coverage to GTE.

By way of background, sue and labor provisions [13] traditionally were included in American and English marine insurance policies in order to "encourage an insured to take measures to preserve the subject matter of the policy." *Int'l Commodities Export Corp. v. Am. Home Assurance Co.*, 701 F.Supp. 448, 452 (S.D.N.Y.1988), *aff'd* 896 F.2d 543 (2d Cir.1990), (citing Buglass, *Marine Insurance and General Average in the United States* 332–35 (2d ed.1981)). The insurer is then obligated to reimburse the insured for any costs or expenses incurred, "since the insured has acted to benefit the insurer by averting or mitigating an otherwise recoverable loss." *Id.* (citing *Blasser Bros., Inc. v. N. Pan–Am. Line,* 628 F.2d 376 (5th Cir.1980)); *see also Zurich Ins. Co. v. Pateman,* 692 F.Supp. 371, 375 (D.N.J.1987) (citing *American Merchant Marine Ins. Co. v. Liberty Sand & Gravel Co.,* 282 F. 514, 520 (3d Cir.1922)).

■ The purpose of the sue and labor clause is to reimburse the insured for costs incurred to satisfy the insured's duty to the insurer. If the insured acts to prevent a loss that is not covered by the policy, there is no duty or benefit to the insurer; "[t]he obligation only exists when the action taken is to prevent a loss for which the underwriter would be liable." *Port of Seattle v. Lexington Ins. Co.,* 111 Wash. App. 901, 48 P.3d 334, 340 (2002) (citing *Reliance Ins. Co. v. The Escapade,* 280

F.2d 482, 488–89 (5th Cir.1960)). In order to recover its alleged sue and labor expenses, the loss GTE acted to avoid must be a loss that is covered by the policies.

■ The policies at issue in this case are all-risk policies. Generally, "[a]n 'all-risk' insurance policy creates a 'special type of insurance extending to risks not usually contemplated, and recovery under the policy will generally be allowed ... unless the policy contains a specific provision expressly excluding the loss from coverage.'" *Victory Peach Group, Inc. v. Greater New York Mut. Ins. Co.,* 310 N.J.Super. 82, 87, 707 A.2d 1383 (App.Div. 1998) (citing 43 Am.Jur.2d *Insurance* § 505 (1982)). It is important to keep in mind, however, that " '[t]he lable "all risk" is essentially a misnomer. All risk policies are not "all loss" policies; all risk policies ... contain express written exclusions and implied exceptions which have been developed by the courts over the years.'" *Ariston Airline & Catering Supply Co. v. Forbes,* 211 N.J.Super. 472, 479, 511 A.2d 1278 (Law Div.1986) (quoting *Standard Structural Steel Co. v. Bethlehem Steel Corp.,* 597 F.Supp. 164, 191 (D.Conn. 1984)).

■ In a dispute regarding the interpretation of an insurance contract, it is generally "the insured's 'burden to bring the claim within the basic terms of the policy.'" *Rosario v. Haywood,* 351 N.J.Super. 521, 529, 799 A.2d 32 (App.Div. 2002) (quoting *Reliance Ins. Co. v. Armstrong World Indus., Inc.,* 292 N.J.Super. 365, 377, 678 A.2d 1152 (App.Div.1996)). If the insurer claims that the matter falls under one of the policy's exclusionary pro-

---

the forum state to the claims at issue. The parties have not argued that there is a conflict of law issue here, and accordingly, this Court will apply New Jersey and other persuasive law.

**13.** For ease of discussion, the Court will refer to the Sue and Labor clause, but the reference is intended to include the almost identical Protection and Preservation of Property clause.

visions, the insurer must establish that the exclusion applies. *See id.* at 530, 799 A.2d 32 (citing *Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.,* 98 N.J. 18, 26, 483 A.2d 402 (1984)). It is the Court's duty to interpret the language of an insurance policy according to its plain and ordinary meaning. *See Voorhees v. Preferred Mut. Ins. Co.,* 128 N.J. 165, 175, 607 A.2d 1255 (1992); *Rosario,* 351 N.J.Super. at 530, 799 A.2d 32 (quoting *Zacarias v. Allstate Ins. Co.,* 168 N.J. 590, 595, 775 A.2d 1262 (2001)). And if the terms of the insurance policy are clear, the Court may not "write for the insured a better policy of insurance than the one purchased." *Longobardi v. Chubb Ins. Co.,* 121 N.J. 530, 537, 582 A.2d 1257 (1990); *Rosario,* 351 N.J.Super. at 530, 799 A.2d 32 (quoting *Gibson v. Callaghan,* 158 N.J. 662, 670, 730 A.2d 1278 (1999)).

## A. The Design Defect and Inherent Vice Exclusions

█ The policies at issue insure against "all risks of physical loss or damage to property described herein ... includ[ing] any destruction, distortion or corruption of any computer data, coding, program or software except as hereinafter excluded." GTE argues that the Y2K problem is covered under this language, as the threatened harm is a risk of physical loss to computer data, programs, and software. The defendants, however, direct the Court's attention to several provisions in the policies which exclude certain perils. The language of the policies states that they do not insure against the cost of repairing defective designs or specifications,[14] or against loss or damage resulting from inherent vice.[15] According to the

defendants, GTE was faced with the threat of harm from excluded perils—threats of an internal nature.

The Court will first consider the defendants' design defect argument. GTE disputes that a design defect is the cause of its Y2K problems, while the defendants argue that the record clearly supports that factual finding.

According to the defendants, the evidence indicates that "GTE did not intend for its systems to contain the Y2K limitation or for such systems to go out of service prior to the year 2000," and as a result, GTE now seeks "coverage for remediation of systems that were defectively designed, specified, or programmed." (Joint Brief in Support of Defendants' Motion for Summary Judgment at 49.) The Court finds the testimony of Joel Cohen, the Program Manager for GTE's Y2K Program, particularly instructive on this issue and supportive of the defendants' argument. Cohen explained that when he designed systems for GTE that were specifically intended to process dates into the twenty-first century, he used a date designation intended to adequately process dates for the intended lifetime of the system:

> I designed systems that had to meet system-specific requirements. And when I recognized that there was a requirement that the system process dates properly into the 21st century, it was my judgment that a method—an appropriate implementation method was necessary to accomplish that requirement, including using four-digit dates or pro-

---

14. The primary layer policies state that they do not insure "against the cost of making good defective design or specifications ...." The excess layer policies state that they do not insure against "faulty ... design from any cause ...."

15. Both the primary layer and excess layer policies state that they do not insure against "inherent vice or latent defect."

cessing with two-digit dates, but correctly interpreting the date and the century. (Catenacci App. Vol. 5, Ex. 87, Deposition of Joel Cohen, at 213:6–213:15.) Cohen further clarified that "[i]f it was clearly intended for [a] system to process beyond 2000, and the system was investigated and through analysis or through tests it was determined that it might have a problem at or beyond 2000, that system required remediation of some sort." (*Id.* at 255:20–255:25.)

The record indicates that the Y2K remediation efforts undertaken by GTE were implemented in order to ensure that systems intended to work in both the twentieth and twenty-first centuries were able to perform as required. The Court finds that any efforts taken to correct a date recognition problem within the computer systems, in order to ensure that the computer systems continue to process dates as expected and required, are efforts undertaken to correct a problem with the design or specification of the system. The evidence demonstrates that GTE required certain computer systems to process dates both before and after the Y2K rollover; these computer systems were not designed to process or recognize such dates; therefore, GTE had to correct the systems in order to ensure proper processing or recognition. These actions fall squarely within the policies' exclusions.

Even though Cohen testified that he would not describe GTE's systems as "defectively designed," his explanation further supports the notion that GTE acted to remediate defectively designed systems:

> I'd say it was not designed to its requirements. . . . The building of a system always relates to its specifications. Specifications are sometimes very clear and sometimes not even there. It's a

wide range in how well things are specified. The next stage of designing to those requirements always involves judgment and capturing the requirements in the design and capturing the implementation in the—from the design—capturing the design in the implementation. . . . So I wouldn't use the word "defect" when discussing the design to the requirements or the implementation to design. [I would use the word "defect"] when there is a clear requirement—explicit, unambiguous requirement—and there's the process of implementing that requirement . . . and through that process the design to that requirement ignores or doesn't satisfy the requirement somehow, then those— that design activity is inadequate. It's in error. It doesn't meet the clear spec. When the spec isn't clear or it doesn't exist, not designing to something that doesn't exist I certainly wouldn't call an "error." It's an inadequate specification.

(Catenacci App. Vol. 5, Ex. 87, Cohen Dep., at 256:4–257:20.)

Cohen interchanges the term "defect" and the term "error," but these words do not have identical meanings. "Error" has been defined, simply, as "[a] mistake." [16] This definition comports with Cohen's explanation regarding a failure to design according to a specific requirement. That would indeed be a mistake. The policies, however, speak of defective designs and specifications. "Defect" has been defined as "[t]he lack of something necessary or desirable for completion or perfection," and "[a]n imperfection that causes inadequacy or failure; a shortcoming." [17] The two-digit date designation clearly falls within this definition.

---

**16.** The American Heritage College Dictionary 467 (3d ed.1984).

**17.** *Id.* at 363.

Michael Lawrence Brodie, who worked as a senior staff scientist and a senior technologist at GTE, testified regarding legacy systems. He explained that

just like everything else in technology, whatever you put into a system now, all of the sudden tomorrow you learn something new. It's not in the system, and you may have to retrofit the system to put that in. So general [sic] speaking, the term "legacy" was used for the ancient old systems. But people began to recognize that as soon as a piece of code is written, since it's concrete and there, it may have problems that one may detect at some point in the future, causing it to then be considered for the same purposes as a legacy system.

(Catenacci App. Vol. 5, Ex. 84, Deposition of Michael Lawrence Brodie at 193:9–193:20.) Brodie further explained that a Y2K conversion can be considered a legacy migration:

The premise is you have a system that has something in it that you don't like, and you want to get into a state where that thing is no longer present. You migrate from one state to another state, whether it is Y2K ... or whether it's an old database system, or a code that is no longer appropriate, whatever it is. You're trying to change an existing system into a new form that no longer manifests the problem you're trying to get away from.

(*Id.* at 194:20–195:6.) Brodie's explanation of legacy migration in the context of the Y2K problem further demonstrates that GTE's Y2K program involved the correction of defects within existing systems in order to prevent the manifestation of any date recognition problems.

GTE's systems required a four-digit designation, or other alternative method to designate the date in order continue to function properly in the face of an event horizon, such as January 1, 2000. The two-digit date designation was an imperfection in the design of the system that prevented it from operating properly. As Cohen stated, "the risk in my view is, if a system has a requirement to run and process dates beyond 2000—if that design and implementation to those requirements is not accurate, that's the nature of the risk." (Catenacci App. Vol. 5, Ex. 87, Cohen Dep. at 418:17–418:21.)

 The Court now turns to an alternative argument—the inherent vice exclusion. Defendants contend that the Y2K limitation is an inherent vice that is excluded under the policies. For support, the defendants look to *Port of Seattle v. Lexington Insurance Co.,* 111 Wash.App. 901, 48 P.3d 334 (2002), where the court determined that the Y2K limitation was an inherent vice: "[B]ut for the two-digit date field code programmed into the Port's software, the arrival of January 1, 2000, would not result in loss. Thus, the Port's Y2K problem is an excluded inherent vice because the date field is an internal quality that brought about its own problem." *Id.* at 339.

As noted by the *Port of Seattle* court, "inherent vice has been defined by various courts as 'any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time.' " *Id.* at 339 (quoting *Mo. Pac. R.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 136, 138–39, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964); *Vana Trading Co. v. S.S. "Mette Skou",* 556 F.2d 100, 104 (2d Cir.1977); *Archer–Daniels–Midland Co. v. Phoenix Assurance Co.,* 975 F.Supp. 1129, 1136 (S.D.Ill.1997); *U.S. Steel Int'l Inc. v. Granheim,* 540 F.Supp. 1326, 1329–30 (S.D.N.Y.1982)). Courts have also noted that the term " 'inherent vice ... relate[s] ... to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction. The

vice must be inherent in the property for which recovery is sought.'" *American Home Assurance Co. v. J.F. Shea Co., Inc.,* 445 F.Supp. 365, 368 (D.D.C.1978) (quoting *Employers Cas. Co. v. Holm,* 393 S.W.2d 363, 367 (Tex.Civ.App.1965)).

The *Port of Seattle* court appears to be the only court to have dealt with inherent vice as it relates to the Y2K problem. While its discussion on the inherent vice issue is neither extensive nor binding, the Court finds it instructive. There, the court determined that the Y2K problem was an excluded inherent vice "because the date field is an internal quality that brought about its own problem." *Port of Seattle,* 48 P.3d at 339.

In *American Home Assurance Co. v. J.F. Shea Co.,* the court determined that the inherent vice exclusion did not apply to the threatened collapse of a system supporting an excavation site, where the threat was most likely due to faulty plane slippage of the earth. The court explained that "[b]ecause the insured property in the case at bar did not contain its own seeds of destruction but rather was threatened by an outside natural force, the exclusion for inherent vice" cannot apply. *American Home Assurance Co.,* 445 F.Supp. at 368.

Here, however, the insured property, GTE's computer systems, do contain their own "seeds of destruction"—that is, the two-digit date limitation. Moreover, GTE is not threatened by any external force; the threat is entirely internal. The Court finds that the exclusion for inherent vice is applicable here.

GTE disputes the applicability of both the design defect and inherent vice exclusions, but it does not reveal any evidence within the record to support its argument. Instead, GTE contends that these exclusion arguments are premature at this point in the litigation. Pointing to *Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223 (3d Cir.1989), GTE claims that design de-

fect is a technical issue requiring expert testimony and possible determination by a jury. GTE mistakenly relies on *Motter,* a products liability action, for the standards applicable in this insurance contract dispute. GTE has not demonstrated that such standards are applicable in this case. The Court also takes issue with GTE's contention that the factual issues regarding design defect are reserved for later stages of this litigation. The Court sees this issue as inextricably tied to the Phase I issue of coverage under the policies.

GTE also argues that the use of a two-digit date designation cannot be a design defect because it is a "best practice." For support, GTE relies on *Leslie v. United States,* 986 F.Supp. 900 (D.N.J.1997), *aff'd* 178 F.3d 1279 (3d Cir.1999). *Leslie,* however, is another products liability case, and does not involve exclusionary language in a property insurance policy. The Court finds no merit to GTE's proposition regarding best practices. The Court further notes that one of GTE's own witnesses stated that the use of the two-digit date designation was not a best practice, but instead, just a common practice. (Catenacci App. Vol. 5, Ex. 87, Cohen Dep., at 42:19–42:22.)

GTE further contends that other courts have determined that the Y2K problem does not stem from a design defect. GTE points to *Kaczmarek v. Microsoft Corp.,* 39 F.Supp.2d 974 (N.D.Ill.1999) to support this proposition. In *Kaczmarek,* the plaintiff tried to bring a class action against Microsoft, alleging that Microsoft sold software that claimed to be, but was not, Y2K compatible. The court determined that the software, a software development program, provided two date field settings. *See id.* at 976. In the "Century On" setting, the programmer was required to use a four-digit date format so that the program would understand both twentieth

and twenty-first century dates. If a two-digit date format was used in this setting, the program would assume a twentieth century date. In the "Century Off" setting, the programmer could use a two-digit date format, and the program would assume a twentieth century date. *See id.* The Court found

> nothing inherently wrong with computer software that assumes a two-digit year entry means the Twentieth Century, particularly when the default setting is disclosed as part of the contract. Moreover, FoxPro is Y2K compliant; a developer can use the Century On feature to provide a four-digit field when a client needs an application that will process dates occurring later than December 31, 1999 . . . .

*Id.* at 977. The case has no bearing on the facts at hand here, and does not support GTE's argument.

Finally, GTE contends that its computer systems faced risk from Y2K related events caused by external systems, and therefore, its claim cannot be barred by the design defect or inherent vice exclusions. According to GTE, it faced the risk that its systems would be corrupted or fail because of its reliance on third party systems with their own date recognition problems, and it also faced the potential for loss resulting from the negligence or inattention of third-party vendors, and the potential for loss from fires or vandalism that could have resulted from Y2K related problems.

This argument gives the Court pause. GTE's statements of material facts describe GTE's various problems with external systems. For example, GTE describes how its systems faced potential failure as a result of "corrupt or destroyed data stemming from interactions with computer systems and networks outside of GTE that were affected by the Y2K rollover" (GTE's Rule 56.1 Statement ¶ 39), and also, that

"GTE faced a separate and distinct risk of Y2K issues from systems that were designed and maintained by third party vendors." (GTE's Supplemental Rule 56.1 Statement ¶ 83). GTE further explained that even after it corrected its own Y2K issues, it "might still have suffered Y2K related failures if they relied on defective third-party sources of data. If an external system had corrupted or distorted data it would be integrated into GTE's data collection and storage systems and corrupt or distort valid data." (*Id.* ¶ 84).

While the Court does not discount the fact that GTE might have faced a legitimate threat from external systems, GTE has failed to identify how its Y2K efforts were intended to prevent such external threats. None of the citations to the record contained in GTE's statement of material facts describes any measures taken to combat these external problems.

GTE claims that it faced a threat of Y2K-related loss from systems designed and maintained by third party vendors. The record, however, does not reflect any action taken by GTE to mitigate that threat. GTE does explain that it contacted its third party suppliers to determine whether their products faced any Y2K compliance issues, and in certain cases, the suppliers either offered GTE replacement products or directions for fixing any potential problem with the product. *See* Catenacci App. Vol. 2, Ex. 11 at 40. In those cases, however, GTE obviously refers to systems designed or provided by third parties but maintained by GTE. The Court fails to see why such systems would not fall under the design defect or inherent vice exclusions, just as the Court fails to see what efforts GTE took to prevent loss threatened by systems wholly maintained by third parties.

As to GTE's contention that it faced threatened losses from external systems

generating corrupted data, GTE has not identified any part of its Y2K program intended to prevent those types of losses. The record before the Court demonstrates that GTE's Y2K program was intended to, and in fact, succeeded in, remediating its internal system problems. When asked whether "any part of GTE's Y2K remediation program involved something other than the correction, repair, improvement, modernization, upgrade or maintenance of GTE's computer systems and software, including hardware and embedded chips," Armen Der Marderosian, GTE's senior vice president of technology and systems, replied that it did not. (Catenacci App. Vol. 5, Ex. 89, Deposition of Armen Der Marderosian at 311:23–312:4.) GTE's 1996 Year 2000 Year End Report summarized the Y2K program:

> The program covers GTE's internal business support systems, products and services that GTE provides its customers, the GTE network infrastructure, and all end user computing assets. Current analysis of the Y2K issue throughout GTE has shown that every business unit of GTE is impacted by this issue. Without appropriate, timely, coordinated action our major customers could suffer denial of service, the delivery of incorrect data, or key system failures.

(Catenacci App. Vol. 4, Ex. 79 at PMO 1704.) The report further identifies several key purposes of the Y2K program, including:

> [to] ensure that operational and functional continuity of all GTE business units is achieved across the millennium date change of 1/1/2000;

> [to] minimize the overall cost of Y2K system migration by pooling resources where feasible, and through standardization of process and methodology across business units;

> [to] ensure interoperability and achieve date standardization of systems across and between business units; and to

> demonstrate confidence in our company, and in our industry, that this business threat can be met and successfully overcome without panic or decline in shareholder value.

(*Id.* at PMO 1704–05.) The record does not reflect that the program was intended to eliminate any external threats, as described by GTE. Based on this record, the Court finds that GTE's Y2K limitation falls under the design defect and inherent vice exclusions.

**B. The Exception to the Exclusions**

■ GTE argues that even if the cause of the Y2K loss was inherent vice or design defect, the policies also insured against the risk of losses that would have resulted from the excluded perils. The defendants counter that the sole purpose of the sue and labor expenses was to correct any design defect or inherent vice— not to prevent any ensuing losses.

■ Both the design defect and inherent vice exclusions in the primary and excess layer policies contain ensuing loss provisions which extend coverage to loss or damage resulting from the excluded perils. " 'Reasonably interpreted, the ensuing loss clause says that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered. The uncovered event itself, however, is never covered.' " *Weeks v. Co-Operative Ins. Cos.*, No. 2002–105, 2003 WL 354979, at *3 (N.H. Feb.19, 2003) (quoting *McDonald v. State Farm Fire & Cas. Co.*, 119 Wash.2d 724, 837 P.2d 1000, 1005 (1992)); *see also Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 139 F.Supp.2d 1374, 1380 (S.D.Fla.2001), *question certified by* 284 F.3d 1228 (11th Cir.2002). According to

GTE, even if it cannot claim coverage for the costs incurred to remediate any design defect or inherent vice, it is not precluded for recovering the costs it incurred to mitigate any loss that would have resulted from the design defect or inherent vice.

Relying again on *Port of Seattle v. Lexington Insurance Co.*, 111 Wash.App. 901, 48 P.3d 334 (2002), the defendants claim that the ensuing loss provision does not apply here. *Port of Seattle* is certainly factually similar to the case at bar. After determining that the Y2K problem fell under the inherent vice exclusion, the court further determined that the Port did not suffer any ensuing loss and therefore, could not avail itself of the ensuing loss exception in its policy. The court explained that the only loss suffered by the Port was the loss caused by the excluded inherent vice. "For it to claim that its losses during testing and assessment constitute a separate, covered peril would render the inherent vice exclusion meaningless." *Id.* at 340. The defendants contend that similarly, GTE seeks only to recover the costs expended to correct the design defect and inherent vice.

Here, however, GTE has done more than claim testing losses; GTE clearly claims that had it not remediated its computer systems in preparation for Y2K, it would have faced separate business interruption losses of great magnitude. GTE contends that had it failed to remedy the Y2K problem, its systems "might have generated incorrect data, thereby corrupting financial records and other databases. Other systems could potentially cease to function, thereby interrupting services that depend upon those systems and causing substantial business interruption losses and other consequential damage." (Fagan App. Vol. 2, Ex. 18 at 19.) Kent Foster, who served as president of GTE, testified that had GTE not undertaken any efforts to eliminate the Y2K program, it would

have faced significant problems: "Some of our systems and some of our programs and some of our networks wold not operate properly. And so it could result in loss of service to our customers. It could result in billing systems not working correctly. It could result in other testing systems not operating appropriately." (Catenacci App. Vol. 5, Ex. 91, Deposition of Kent B. Foster at 64:25–65:5.)

Armen Der Marderosian, GTE's senior vice president of technology and systems, testified that the only reason GTE undertook the Y2K program was to ensure business continuity. (Catenacci App. Vol. 5, Ex. 88, Marderosian Dep. at 48:16–48:18; 214:4–214:13.) Joel Cohen similarly testified that the reason for implementing the Y2K program "was to ensure that our systems and business functions continue to operate without interruption, and that there not be business failure as a result of Y2K or other date-related problems." (Fagan App. Vol. 2, Ex. 34, 399:4–399:9.)

GTE goes beyond describing loss to its defective computer systems; it describes separate business interruption losses that would be caused by the failure of the computer systems. Viewing the evidence in the light most favorable to GTE, the Court is satisfied that GTE faced potential business interruption losses that may have directly resulted from the damage to GTE's covered property. The Court is further satisfied that GTE undertook its Y2K remediation efforts to prevent such business interruption losses. This finding, however, does not end the Court's analysis.

Upon examining the policy language regarding business interruption losses, the Court concludes that the policies do not cover the losses at issue here. The provisions pertaining to business interruption loss provide that the policies cover "[l]oss resulting from necessary interruption of

business conducted by the Insured and *caused by loss, damage, or destruction by any of the perils covered herein* during the term of this policy to real and personal property . . . ." (emphasis added.) The ensuing loss provisions clearly only provide coverage for a *covered* loss ensuing from one of the excluded perils.

Here, the business interruption losses would have resulted from damage to covered property caused by the design defect or inherent vice. Under the plain language of the policies, the business interruption loss must be caused by a covered peril.[18] As discussed above, design defects and inherent vice are not perils covered by the policy, and therefore, the business interruption loss ensuing from a design defect or inherent vice would not be a covered loss.

 While GTE need not show that a covered loss occurred in order to invoke coverage under the sue and labor clause, it does need to show that its actions were taken to prevent a covered loss. *See Wolstein v. Yorkshire Ins. Co.*, 97 Wash.App. 201, 985 P.2d 400 (1999) (citing *White Star S.S. Co. v. N. British & Mercantile Ins. Co.*, 48 F.Supp. 808, 813 (E.D.Mich.1943)). GTE has not made that showing.

Having determined that the policies do not provide coverage for GTE's claims, the Court need not address the other arguments raised by the parties. The Court will grant the defendants' joint motion for summary judgment on counts one and two of the complaint.

### III. Allendale's Motion for Summary Judgment on Count Three

 In the third count of its complaint, GTE brings a claim for bad faith against defendant Allendale. Allendale now moves for summary judgment on the third count, claiming that the lack of coverage for GTE's claim of loss is fatal to GTE's bad faith claim. GTE does not dispute that its bad faith claim must fail in light of the Court's finding of non coverage. Having determined that there is no coverage, the Court now finds that GTE cannot maintain its bad faith claim. The Court will grant Allendale's motion, and the third count of GTE's complaint will be dismissed.

### IV. GTE's Motion for Partial Summary Judgment

GTE seeks summary judgment on the issue of whether its all-risk policies covered harm to its property threatened by Y2K. Specifically, GTE has asked the Court to hold that GTE's all-risk policies cover any harm to GTE's computer data and cover direct and resulting Y2K harm to any of GTE's covered property. At first glance, this motion appears to take on broader issues than those addressed in the defendants' joint summary judgment motion. Upon further reading, however, the Court concludes that this motion is in essence a rehashing of the arguments addressed in the defendants' joint motion, and the Court declines to address these issues a second time. For the reasons discussed above, the Court will deny GTE's motion for partial summary judgment.

### V. Federal's Motion for Summary Judgment on its Counterclaim

Federal filed a counterclaim seeking declarations that GTE is not entitled to coverage under the Federal policy. Fed-

---

18. While the Court views all of the potentially ensuing losses, as described by GTE, as losses which would fall under the provision for business interruption for gross earnings, the Court notes that other provisions in the policies also contain this language limiting business related losses to those caused by a covered peril. These include provisions providing coverage for loss of toll records, and business interruption for loss of profits.

eral now seeks summary judgment on those counterclaims. Having already determined that GTE is not entitled to coverage under the defendant insurers' policies, including Federal's policy, the Court will not address the issue any further. Because this motion seeks the same relief that has already been provided to the parties, the Court will grant Federal's motion.

## VI. IRI's Motion for Summary Judgment

IRI has filed a supplemental motion for summary judgment, providing additional reasons why the claims against it should be dismissed. Because the Court has already provided the relief requested by IRI, the motion will be granted.

## CONCLUSION

For the foregoing reasons, the defendants' joint motion for summary judgment will be granted in its entirety. Defendant Allendale's motion for partial summary judgment will also be granted. GTE's motion for summary judgment will be denied. The Court will grant the supplemental summary judgment motions brought by defendants IRI and Federal. GTE's complaint will be dismissed in its entirety.