

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-21-2004

# GTE Corp v. Allendale Mutl Ins

Precedential or Non-Precedential: Precedential

Docket No. 03-2139

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"GTE Corp v. Allendale Mutl Ins" (2004). *2004 Decisions.* Paper 543.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/543

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-2139

_____

GTE CORPORATION,

Appellant

v.

ALLENDALE MUTUAL INSURANCE
COMPANY;
AFFILIATED FM INSURANCE
COMPANY;
ALLIANZ INSURANCE COMPANY;
FEDERAL INSURANCE COMPANY;
INDUSTRIAL RISK INSURERS

_____

On Appeal from the United States
District Court
for the District of New Jersey
(Dist. Ct. No. 99-cv-02877)
District Judge: Honorable Alfred M.
Wolin

_____

Argued: December 9, 2003

Before: AMBRO, FUENTES and
CHERTOFF, Circuit Judges.

(Filed: June 21, 2004)

ROBERT F. RUYAK (Argued)
JERROLD J. GANZFRIED
Howrey, Simon, Arnold & White
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

Counsel for Appellant

HENRY J. CATENACCI (Argued)
Podvey, Sachs, Meanor, Catenacci,
Hildner & Cocoziello
One Riverfront Plaza
The Legal Center, 8th Floor
Newark, NJ 07102

Counsel for Appellees Allendale
Mutual Insurance and Afilliated FM Ins.
Co.

MARY K. VYSKOCIL (Argued)
Simpson, Thatcher & Bartlett
425 Lexington Ave.
New York, NY 10017

Counsel for Appellee Industrial
Risk Insurers

WILLIAM N. ERICKSON
Robins, Kaplan, Miller & Ciresi
111 Huntington Avenue
Suite 1300
Boston, MA 02199

Counsel for Appellee Allianz Ins.
Co.

RICHARD M. MACKOWSKY
Cozen & O'Connor
1900 Market Street
The Atrium
Philadelphia, PA 19103

BERNADETTE N. GORDON
Cozen & O'Connor
One Newark Center
Suite 1900
Newark, NJ 07102

Counsel for Appellee Federal
Insurance Company

———

OPINION

———

CHERTOFF, Circuit Judge.

Plaintiff-Appellant GTE
Corporation ("GTE") seeks coverage for
costs and expenses incurred in remediating
its computer systems to avoid Year 2000
(Y2K) related date recognition problems.
GTE contends that it is entitled to such
costs and expenses pursuant to insurance
policies entered into with Defendant-
Appellees Allendale Mutual Insurance
Company ("Allendale"), Affiliated FM
Insurance Company ("Affiliated"), Allianz
Insurance Company ("Allianz"), Federal
Insurance Company ("Federal"), and
Industrial Risk Insurers ("IRI")
(collectively "Insurers"). The District
Court granted summary judgment in favor
of the Insurers. Specifically, the District
Court concluded that: (1) GTE's Y2K
remediation falls under the design defect
and inherent vice exclusions of the
policies; (2) the exceptions to these
exclusions were inapplicable; and (3) the
Sue and Labor and Preservation of
Property Clauses (hereinafter referred to
collectively as the "Sue and Labor

Provisions") of the policies did not entitle
GTE to coverage for costs incurred to
prevent an excluded loss. For the reasons
stated below, we will affirm the District
Court's grant of summary judgment.

**I.**

**A. The Y2K Problem**

The approach of the year 2000
evoked fears of various millenarian
catastrophes. One such fear was the "Y2K
problem," and it arose from the entirely
predictable fact that the passing of the year
1999 resulted in a change in all four digits
of the written representation of the
succeeding years.

Historically, software was routinely
programmed omitting the first two digits
in year dates. See, e.g., Steve Lohr,
Technology and 2000—Momentous
Relief; Computers Prevail in First Hours
of '00, N.Y. Times, January 1, 2000, at
A1. There were a number of reasons for
this traditional use of two-digit years as an
ingredient of software programing. "The
two-digit shortcut originally was taken to
conserve space that a four-digit entry
would have occupied in a computer's
memory." Bruce W. Foudree, The Year
2000 Problem and the Courts, 9 Kan. J.L.
& Pub. Pol'y 515, 517 (2000).
Particularly in light of the high cost of
storing information in the early days of
computers, this shortcut provided
numerous benefits, including "allow[ing]
substantial cost savings," enabling
"[m]anufacturers . . . to make chips
available to consumers at more affordable
prices," and "shortening the production
time for chips and software." Id.

2

With the approach of the year 2000, however, experts voiced dire predictions that the four-digit changeover could utterly upset computer programs. This problem, commonly referred to as the "Y2K problem," is essentially summarized as follows:

> [C]omputers have trouble distinguishing between years in the 1900s and years in the 2000s. Until comparatively recently, date-sensitive computer programs identified years by their last two digits. For example, using the standard format of mm/dd/yy, 1988 was entered as "88" by programers. Thus, on January 1, 2000, many computers and equipment which contain computer chips ("embedded chips") may not be able to recognize the difference between 1900 and 2000 since both are abbreviated as "00."

Foudree, supra, at 516-17; see also Jeffrey W. Stempel, A Mixed Bag for Chicken Little: Analyzing Year 2000 Claims and Insurance Coverage, 48 Emory L.J. 169, 177 (1999).

Commentators acknowledged that while "[n]o one can accurately predict the scope, severity, or duration of Y2K disruptions . . . , Y2K-related failures have the potential to touch every sector of society and cause widespread and systemic economic failures and public panic." Foudree, supra, at 517-18. A likely scenario of the consequences of the Y2K problem was described as follows:

> The most common scenario for a Y2K problem involves a computer reading two-digit dates of "00" or "01" and either being stymied (if an inanimate object can be stymied) or reading the dates erroneously as "1900" or "1901," a misreading that in the estimation of many has "potentially devastating results."
>
> For example, information systems may lock or freeze, causing interruptions and emergency repairs or perhaps even requiring the discarding of old equipment and its replacement with new. Misread dates could lead to lost funds, improperly administered medicine, or failure to replenish inventory. For example, an insurance policy could be canceled, a lease terminated, or astounding late fees assessed when a computer mistakenly reads the date "2000" as "1900."

Stempel, supra, at 177 (internal citations omitted).

These fears prompted the

undertaking of extensive Y2K remediation efforts. Corporations and governments invested more than $250 billion worldwide in addressing the Y2K program, with the United States government alone spending $8.4 billion. Lohr, supra, at A1.

In retrospect, we now know that catastrophe did not materialize, perhaps in part because of the success of remediation efforts. See, e.g., Lohr, supra, at A1. Nevertheless, the benefit of hindsight should not cloud our appreciation of the widespread perception, in the years leading up to 2000, that failure to correct the Y2K problem could result in disastrous consequences. Moreover, even those who did not predict "catastrophic" consequences cautioned that the Y2K problem was "serious enough to require correction if contemporary business is to continue to function in the twenty-first century." Stempel, supra, at 172.

## B. GTE's Y2K Efforts

Because this is an appeal from a grant of summary judgment, we must view the evidence in the light most favorable to the nonmoving party GTE. See Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004).

GTE is a worldwide leader in telecommunications services, including local telephone, wireless, and internet services. GTE operated a substantial number of computer based systems and networks which employed the common practice of two-digit date recognition. As the new millennium approached, GTE identified several Y2K-related threats.

Such harms included the prospect that GTE's computer programs and external programs interacting with GTE's systems would crash immediately, make erroneous calculations while continuing to process, endlessly churn before taking a "time out" or shutting down, or process data correctly to no avail. GTE's Rule 56.1 Statement of Material Facts ¶ 38, J.A. at 3118 (citing GTE 2000 President's Operations Review, p. CORP PMO 1893938 (Exhibit 35)).

In an effort to protect its expansive network, GTE undertook an extensive Y2K Program at a cost of about $350 million to protect data, records, and to ensure continued business operations. In a December 1998, corporate disclosure document, GTE explained its activities as follows:

> GTE's Year 2000 program is focused on both information technology (IT) and non-IT systems . . . .
>
> . . . .
>
> GTE's Year 2000 program has been organized into five phases as follows: Awareness: program definition and general education; Assessment: analysis and prioritization of systems supporting the core business; Renovation: rectifying Year 2000 issues; Validation: testing the Year 2000 solutions; Implementation: placing the tested systems into production.

4

GTE Corp. 10-K for 12/31/98, J.A. at 3979-80.

Notably, GTE appears to have been aware of the potential threat posed by the Y2K problem as early as 1994. In December of that year, GTE Service Corporation published a report entitled Algorithmic Anarchy: Chaos in the Year 2000, identifying the potential impact of the Y2K problem on GTE, and outlining preliminary strategies for addressing the problem. See J.A. at 1395-1428. In 1995, GTE established a Program Management Office (PMO) "to oversee the planning and execution of a corporate-wide Year 2000 initiative," as well as a "Master Schedule for GTE's Year 2000 Program." GTE Millennium 2000 Program–Year 2000 Year End Report–1996 (December 10, 1996), J.A. at 1598, 1602 ("1996 Year End Report"). Moreover, in 1996 GTE completed the Proposed Criteria for "Century Compliance", "provid[ing] information regarding the scope of the . . . (Y2K) challenge and . . . identif[ying] and discuss[ing] four suggested criteria for consideration in assessing century compliance." J.A. at 1477. From the inception of its Y2K program, GTE exhibited an awareness of the tremendous resources required to address the date-recognition problem. For example, the 1996 Year End Report reported that the "cost of the Year 2000 Program is currently estimated to be $361 [million]." J.A. at 1598.[1]

---

[1] The Report explains, "These costs include not only the conversion of our legacy systems, but also: the anticipated

### C. Insurance Policy Provisions

GTE contends that in an effort "[t]o protect its expansive network from damage and destruction, [it] . . . contracted for extensive insurance protection." Appellant Br. at 11. The insurance policies to which GTE refers were sold in 1996 and 1997. As the District Court explained, GTE was actually insured by a "panel of insurers" who provided different percentages of coverage on the primary layer and excess layer of coverage.[2]

---

impacts to our networks, switches, and network management systems; changes necessary to continue electronic operations with our major business and financial partners; upgrades to customer premise equipment for which GTE is responsible; changes required to systems which have been developed by GTE for commercial resale; and the costs to incorporate changes made to other third-party software systems providing basic functionality to GTE's business operations." J.A. at 1598.

Interestingly, the Report also outlines potential sources of funding for the program. The Report does not suggest that the costs might be reimbursable through insurance, but instead suggests the following funding mechanisms—"Business as Usual," "Opportunity Cost," "Incremental Cost," "Replacement Funds," and "Customer Funds." Id.

---

[2] The primary layer provides $50 million in coverage, and the excess layer provides $400 million in coverage for losses in excess of $50 million. Because

5

Although the policies at issue in this litigation are actually five distinct policies, because the terms of the relevant policy provisions are identical, the District Court and the parties did not analyze the provisions separately. Therefore, we do not differentiate among the policies.[3]

the claim in this case does not exceed $400 million, we are not concerned with the blanket layer of coverage that provides insurance for claims in excess of $400 million.

Primary layer coverage was divided among the Insurers as follows—Affiliated (40%), see J.A. at 237, IRI (20%), see J.A. at 416, Allianz (10%), see J.A. at 630, Federal (10%), see J.A. at 703. Excess layer coverage was divided among the Insurers as follows—Allendale (40%), see J.A. at 278, IRI (20%), see J.A. at 416, and Allianz (10%), see J.A. at 630. These percentages do not add up to 100% because coverage was also provided by insurance companies who are not a party to this suit (because these other policies contained mandatory arbitration clauses). See GTE Corp. v. Allendale Mut. Ins. Co., 258 F. Supp. 2d 364, 369 & n.4 (D.N.J. 2003).

[3] The only relevant distinction pertains to Federal and IRI's supplemental motions for summary judgment. Federal and IRI argue that GTE's Y2K costs were not incurred to prevent loss that would have occurred during their policy periods, which ended on July 1, 1999. Because, as discussed below, we do not reach the supplemental grounds for affirmance, we

The primary layer policies outline the scope of the coverage. In pertinent part, the provisions read:

COVERAGE

Except as hereinafter excluded, this policy covers:

a. Real and Personal Property

(1) The interest of the Insured in all real and personal property (including improvements and betterments) owned, used, or under contract to be purchased or leased by the Insured, or hereafter constructed, erected, installed, or acquired including while in course of construction, erection, installation, and assembly.

. . . .

b. Business Interruption–Gross Earning

Coverage shall apply under this section unless there is a loss of profits policy in

need not analyze this distinction in policy terms.

6

force covering the location where loss is incurred.

(1) Loss resulting from necessary interruption of business conducted by the Insured and caused by loss, damage, or destruction by any of the perils covered herein during the term of this policy to real and personal property . . . not otherwise excluded.

Affiliated FM Insurance Policy No. AE016 [hereinafter "Affiliated Policy"], J.A. at 241; IRI Policy No. 31-3-64676 [hereinafter "IRI Policy"], J.A. at 425; Allianz Policy No. CLP 1025660 [hereinafter "Allianz Policy"], J.A. at 643; Federal Policy No. 648-22-99 [hereinafter "Federal Policy"], J.A. at 712.

The policies also specifically outline included perils:

PERILS INSURED AGAINST

This policy insures against all risks of physical loss of or damage to property described herein including general average, salvage, and all other charges on shipments covered

hereunder, *except as hereinafter excluded*.

Physical loss or damage shall include any *destruction, distortion or corruption of any computer data*, coding, program or software except as hereinafter excluded.

Affiliated Policy, J.A. at 252; IRI Policy, J.A. at 437; Allianz Policy, J.A. at 655; Federal Policy, J.A. at 724 (emphasis added).

Certain perils, however, are explicitly excluded:

PERILS EXCLUDED

This policy does not insure:

. . . .

c.    against the cost of making good defective design or specifications, faulty material, or faulty workmanship. This exclusion shall not apply to loss or damage resulting from such defective design or specifications, faulty material, or faulty workmanship; however any such resulting damage will be subject to all other exclusions in this Policy.

7

. . . .

k.  against unexplained loss, mysterious disappearance, loss or shortage disclosed on taking inventory, inherent vice or latent defect unless loss or damage from a peril insured herein ensues and then this policy shall cover for such ensuing loss or damage.

Affiliated Policy, J.A. at 252-55; IRI Policy, J.A. 438-40; Allianz Policy, J.A. at 656-58; Federal Policy, J.A. at 725-27.

The excess layer policies similarly provide, in pertinent part:

EXCLUSIONS

. . . .

This Policy does not insure against:

. . . .

3.  faulty workmanship, material, construction or design from any cause; all unless physical damage not excluded by this Policy results, in which event, this Policy will cover only such resulting damage;

. . . .

5. deterioration, depletion, rust, corrosion, erosion, wear and tear, inherent vice

or latent defect; all unless physical damage not excluded by this Policy results, in which event, this Policy shall cover only such resulting damage . . . .

Allendale Policy, J.A. at 297-99; IRI Policy, J.A. at 454-56; Allianz Policy, J.A. at 676-78.

Moreover, the excess layer policies contain a "Business Interruption Endorsement" which provides, in pertinent part:

In consideration of additional premium, this Policy is extended to cover the Actual Loss Sustained by the Insured during a Period of Interruption directly resulting from physical loss or damage of the type insured against by this Policy, to property not otherwise excluded by this Policy, utilized by the insured and located as described elsewhere in this Policy.

Allendale Policy, J.A. at 306; IRI Policy, J.A. at 463; Allianz Policy, J.A. at 685.

In addition to the above coverage and exclusion provisions, both the primary and excess policies contain clauses that permit GTE to recover for certain preventative measures.

The primary policies contain Sue and Labor Clauses providing, in pertinent part:

8

<u>Sue and Labor</u>

In the case of actual or imminent loss or damage by a peril insured against, it shall, without prejudice to this insurance, be lawful and necessary for the Insured, their factors, servants, or assigns to sue, labor, and travel for, in, and about the defense, the safeguard, and the recovery of the property or any part of the property insured hereunder; nor, in the event of loss or damage, shall the acts of the Insured or of this Company in recovering, saving, and preserving the insured property be considered a waiver or an acceptance of abandonment. This Company shall contribute to the expenses so incurred according to the rate and quantity of the sum herein insured. This provision does not increase any amounts or limits of insurance . . . .

Affilliated Policy, J.A. at 265; IRI Policy, J.A. at 450; Federal Policy, J.A. at 737.

Similarly, the excess layer policies contain Preservation and Protection of Property Clauses providing, in pertinent part:

In case of actual or imminent physical loss or damage of the type insured against by this Policy, the expenses incurred by the Insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder shall be added to the total physical loss or damage otherwise recoverable under this Policy . . . .

Allendale Policy, J.A. at 301; IRI Policy, J.A. at 458; Allianz Policy, J.A. at 680.

## D. Procedural History and Standard of Review

On June 18, 1999, GTE filed a declaratory judgment action seeking coverage for costs and expenses incurred remediating its computer systems to avoid Y2K problems: Count One sought a declaratory judgment that the costs were covered by the policies' Sue and Labor Provisions; Count Two alleged breach of contract; and Count Three sought damages from Allendale for bad faith. The Appellees each answered the complaint, and Appellee Federal counterclaimed seeking a declaration denying coverage. To facilitate the ease of the litigation, on August 31, 2000, the U.S. Magistrate Judge entered an order dividing the litigation into phases. In Phase I, the parties were instructed to address whether insurance coverage existed under the insurance policies. Following discovery on Phase I issues, the parties filed motions for summary judgment on October 16, 2002.

The District Court properly

9

exercised jurisdiction under 28 U.S.C. § 1332.[4] On March 26, 2003, the District Court granted the Insurers' joint motion for summary judgment in its entirety. As an initial matter, the District Court noted that the Sue and Labor Provisions only permit GTE to recover for costs incurred to prevent a loss that is covered under the policies. The District Court went on to conclude that the Y2K problem was not covered because it fell within the design defect and inherent vice exclusions. Moreover, the exceptions to these exclusions—the ensuing and resulting loss provisions—did not permit GTE to recover. In light of this finding of non-coverage, the District Court also granted Allendale's motion for summary judgment on the third count claim of bad faith (that is, there being no coverage, GTE cannot claim bad faith denial of coverage). The

---

[4] At the time of suit, GTE was a corporation organized under the laws of New York with its principal place of business in Texas. Allendale and Affiliated were corporations organized under the laws of Rhode Island with their principal places of business in Rhode Island; Allianz was a corporation organized under the laws of California with its principal place of business in California; Federal was a corporation organized under the laws of Indiana with its principal place of business in New Jersey; and IRI was a corporation organized under the laws of Connecticut with its principal place of business in New Jersey. The amount in controversy exceeded $75,000.

District Court also granted IRI and Federal's supplementary summary judgment motions, alleging that GTE's Y2K costs were not incurred to avoid loss or damage that occurred during those Insurers' policy periods.[5]

Notice of appeal was timely filed on April 17, 2003. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We conduct plenary review over a district court's order granting summary judgment. Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 679 (3d Cir. 2003). Summary judgment will be granted if the record establishes "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574 (1986).[6] For the reasons elaborated below,

---

[5] In granting IRI and Federal's supplementary motions, however, the District Court did not specifically reach the merits of the claim. Instead, the District Court concluded that it could grant the motions without reaching these issues because the relief requested had already been provided by virtue of its grant of Insurers' joint motion for summary judgment. See 258 F. Supp. 2d at 381-82.

[6] In concluding that the District Court properly granted summary judgment, there are several issues that we do not reach. First, we need not decide

10

we agree with the District Court.

## II.

As a preliminary matter, GTE argues that consideration of the exclusionary provisions was premature because "factual issues regarding design defect are reserved for later stages of the litigation." See GTE Corp. v. Allendale Mut. Ins. Co., 258 F. Supp. 2d 364, 377 (D.N.J. 2003). GTE argues that there is a disputed factual issue, which cannot be resolved on summary judgment, about whether two-digit software programming is a design defect or inherent vice. Furthermore, GTE argues that these issues of fact fall within the province of a jury. We are unpersuaded.

_____

the merits of Federal and IRI's supplemental motions for summary judgment because we conclude that, irrespective of the time frame issue, the policies did not provide coverage. Second, we do not examine whether affirmation of the District Court's opinion is warranted on the basis of independent legal arguments raised by the Insurers, including the arguments that (a) GTE's Y2K costs were not fortuitous at inception of the policies; and (b) GTE failed to comply with the Policies' notice and suit limitations provisions. While this Court "may affirm a district court's grant of summary judgment on any ground that appears in the record," Hedges v. Musco, 204 F.3d 109, 116 (3d Cir. 2000), we see no reason to do so in light of our conclusion that the policies did not cover Y2K compliance costs.

The motions for summary judgment were brought following discovery in Phase I of the litigation, pertaining to whether insurance coverage existed for GTE's claims. As the District Court noted, any factual issues pertaining to whether the Y2K problem constitutes a design defect are "inextricably tied to the Phase I issue of coverage." Id. In fact, perhaps the most quintessential coverage issue is the applicability of policy exclusions. Moreover, there is no indication that GTE was prohibited by order or otherwise from taking any discovery relevant to the coverage issue.[7] If GTE felt that additional evidence, including expert testimony, was required, GTE was free to conduct such discovery and present such evidence to the District Court. To the extent GTE's argument constitutes a challenge to the District Court's discovery orders, this Court will not disturb those discovery decisions because there has been no showing of an abuse of discretion. See Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir. 1986). Thus, the exclusionary provisions were properly

_____

[7] In support of the contention that it was denied discovery, GTE references J.A. at 4734-35 and J.A. at 4794. See Appellant Br. at 45-46. These references are to GTE's Memorandum in Response to Defendants' Joint Motion for Summary Judgment and GTE's Supplemental Rule 56.1 Statement of Material Facts, respectively. Neither provides any specific indication of what discovery GTE was prohibited from taking.

11

within the consideration of the District Court in considering the motions for summary judgment in Phase I of the litigation.

In addition, the design defect issue did not need to be resolved by a jury. We agree with the District Court that in arguing that the issue falls within the province of the jury, GTE erroneously looks to products liability cases for the standards applicable to this insurance contract dispute. See Motter v. Everest & Jennings, Inc., 883 F.2d 1223 (3d Cir. 1989) (cited before the District Court) (holding issues of whether product was defectively designed and whether defective design was proximate cause of injury were jury questions); Rooney v. Federal Press Co., 751 F.2d 140, 144 (3d Cir. 1985) (Hunter, III, J., dissenting in part and concurring in part) (internal quotations and citations omitted) (cited in Appellant Br.) ("The question whether a design defect exists, that is, whether the product left the supplier's control lacking an element necessary to make it safe for its intended use, remains within the province of the jury."). This case does not involve a question of whether a product was defectively designed for purposes of a tort action. GTE cites no case concluding that (and offers no explanation as to why) product liability cases and concepts, which concern the balance between "the risk of a product versus its social utility," Motter, 883 F.2d at 1227, are relevant to insurance contract disputes that involve agreements between specific parties. The issue of whether the defective design and inherent vice exclusions bar recovery were questions of contract interpretation properly within the province of the District Court at the summary judgment stage of the litigation.

### III.

Generally, under New Jersey law,[8] "the interpretation of insurance contracts requires generous readings of coverage provisions, narrow readings of exclusionary provisions, resolution of ambiguities in favor of the insured, and construction consistent with the insured's reasonable expectations." Cobra Prods.,

_____

[8] While there is some dispute over whether New Jersey law governs, both parties concede that the choice of law is not dispositive in this case, as the standard governing contract interpretation is the same under each of the potentially applicable bodies of law. Insurers explain in their brief:

> Throughout its brief, GTE relies on New Jersey law. The facts in this case also support an argument that the law of New York or Connecticut applies. Because the laws of any relevant jurisdiction are the same with respect to the issues raised on this appeal and lead to the same result, choice of law should not be an issue. The Insurers do not concede, however, that this dispute is governed by New Jersey law.

Appellee Br. at 26 n.6.

12

Inc. v. Fed. Ins. Co., 722 A.2d 545, 549 (N.J. Super. Ct. App. Div. 1998); see also Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F. Supp. 447, 452 (D.N.J. 1998). Insurers contend this rule is inapplicable where the insured is a large sophisticated corporation, such as GTE. See Pittson Co. v. Allianz Ins. Co., 905 F. Supp. 1279, 1320 (D.N.J. 1995), rev'd in part 124 F.3d 508, 521 (3d Cir. 1997). However, we need not address this issue because we conclude that the contract is not ambiguous; rather, the exclusions clearly bar coverage. Because the contract in this case is "clear and unambiguous . . . [,][it] must be enforced as written." Cobra, 722 A.2d at 549.

## A. Policy Exclusions

We agree with the District Court that coverage for GTE's remediation measures is barred by the plain language of both the defective design and inherent vice exclusions, and disagree with GTE's contention that its claim is not subject to these exclusions because the threats were external.

## 1. Defective Design Exclusion

The policy provisions outlining excluded perils specifically preclude coverage for "the cost of making good defective design or specifications." The District Court concluded that "any efforts taken to correct a date recognition problem within the computer systems, in order to ensure that the computer systems continue to process dates as expected and required, are efforts undertaken to correct a problem with the design or specification of the system." 258 F. Supp. 2d at 375.

We agree.

The Y2K problem squarely falls within the defective design or specification exclusion. The essence of the Y2K problem is that the two-digit date design precludes the system from functioning properly on or after January 1, 2000. The problem in this case was not that a program or system malfunctioned, or some external threat caused damage to GTE's systems. Rather, the system performed in exactly the manner it was designed to operate—the problem is that the system as designed and specified did not permit recognition of dates in the 21st century.[9]

GTE argues that the two-date designation system cannot be a "defective" design because, at the time of its implementation, such a design conformed with industry standard (either as a widespread practice or "best practice"), complied with government regulation, and was required for GTE's systems to be able to interface with other systems. Even assuming all these factors

---

[9] Even GTE's characterization of the Y2K problem supports the conclusion that it falls within the defective design exclusion. At argument, GTE's counsel explained the problem as follows: "It is the data coming in is in a different format than was anticipated when the system was *designed*." Tr. of Argument at 7:13-15 (emphasis added). In other words, it is the system's inability, as designed, to recognize and process the data, and not a problem with the data itself.

13

are true, we still conclude that GTE's claim is barred by the defective design exclusion. Industry standards and the existence of alternative feasible designs may be relevant standards in determining whether there is a "design defect" for the purpose of tort liability. See, e.g., Restatement (Third) of Torts: Prod. Liab. § 16, cmt. b (1998). The fact that something was designed in accordance with "best practice" or industry standard does not, however, mean that GTE's insurance policy provides coverage for necessary changes and upgrades to that system.

The policies in this case explicitly exclude the "cost of making good defective design or specification." "Defective" is defined as "[a]n imperfection or shortcoming, esp. in a part that is essential to the operation or safety of a product." Black's Law Dictionary 429 (7th ed. 1999).[10] Here there was an "imperfection or shortcoming"—the inability of the system to properly read dates on or after the year 2000—in the system's design or specification. The District Court pointed to extensive testimony from GTE employees to buttress the conclusion that the remediation

measures fall within the policies' exclusions. See 258 F. Supp. 2d at 374-76. Admittedly, some of this testimony is confusing.[11] Nevertheless, this testimony supports the view that GTE's remediation efforts were taken to correct an "imperfection or shortcoming" in the two-digit system, and thus fall within the policies' defective design exclusions. For example, in the context of explaining the relationship between Y2K and "legacy migration,"[12] Michael Lawrence Brodie, who worked as a senior staff scientist and a senior technologist at GTE, testified:

> The premise is you have a system that has something in it that you don't like, and you want to get into a state where that thing is no longer present. You migrate from one state to another state, whether it is Y2K . . . or whether its an old database system, or a

___

[10] Black's Law Dictionary separately defines "defect" and the corresponding adjective "defective" from the term "design defect." See Black's Law Dictionary 429 (7th ed. 1999). Notably, here the language of the policies says "defective design," rather than using the tort liability concept of "design defect."

[11] At argument, the Court attempted to clarify portions of the testimony of Joel Cohen, Program Manager for GTE's Y2K Program. In the course of this clarification, even GTE's counsel acknowledged that the testimony is "confusing." Tr. of Argument at 10:13-20.

[12] Brodie explained that the term "legacy migration" "describe[s] the transformation of a system . . . from one state to an improved state." Deposition of Michael Lawrence Brodie at 195:11-15, J.A. at 2364.

14

code that no longer is appropriate . . . . You're trying to change an existing system into a new form that no longer manifests the problem you're trying to get away from.

Deposition of Michael Lawrence Brodie at 194:20-195:6, J.A. at 2363-64. In other words, Y2K remediation, like other database and code upgrades, is targeted at changing an existing system because of a problem or limitation within that system.

The fact that GTE may have utilized the best available system, and subsequently faced the need to remedy a problem with that system, does not save GTE from the defective design exclusion. Taken to its logical conclusion, GTE's argument would render virtually every business upgrade an insurable risk. For example, GTE could argue that upgrades to its software or computers undertaken in the name of mitigating an insurable risk would be insurable as long as it used the best system at the time of initial installation.

GTE also suggests that a design cannot be faulty if it meets the specifications at the time of its design. That is unpersuasive. If, for example, an airplane is built pursuant to specifications and is unable to take-off, it is "defective" or contains an "imperfection or shortcoming" despite the fact that it conformed with the specifications. More important, GTE's very argument is undermined by the plain language of the policy provisions. The defective design provision expressly provides that the policy does not ensure "against the cost of making good defective design *or specifications*." (emphasis added).

## 2. Inherent Vice Exclusion

There is an additional ground to reject GTE's coverage claim: the insurance policies explicitly do not insure against "inherent vice." The District Court concluded that, in addition to the defective design exclusion, the inherent vice provision barred GTE from recovering for Y2K remediation measures. In reaching this conclusion, the District Court relied heavily, as persuasive authority, on the Washington Court of Appeal's conclusion in Port of Seattle v. Lexington Ins. Co. that the Y2K problem was an inherent vice. 48 P.3d 334 (Wash. Ct. App. 2002).

As noted by the District Court, the Port of Seattle Court began by surveying definitions of "inherent vice":

An inherent vice is defined by various courts as "'any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time.'" It is also defined "as a cause of loss not covered by the policy, does not relate to an extraneous cause but to a loss entirely from internal decomposition or some

15

quality which brings about its own injury or destruction. The vice must be inherent in the property for which recovery is sought."

48 P.3d at 338-39 (quoting Mo. Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 136 (1964); Employers Cas. Co. v. Holm, 393 S.W.2d 363, 367 (Tex. App. 1965)) (additional citations omitted). In other words, the question is whether the "insured property . . . contain[s] its own seeds of destruction . . . [or whether it] was threatened by an outside natural force." American Home Assurance Co. v. J. F. Shea Co., Inc., 445 F. Supp. 365, 368 (D.D.C. 1978).

Port of Seattle went on to conclude that the Y2K problem fell within the inherent vice exclusion: "[B]ut for the two-digit date field code programmed into the Port's software, the arrival of January 1, 2000, would not result in loss. Thus, the Port's Y2K problem is an excluded inherent vice because the date field is an internal quality that brought about its own problem." 48 P.3d at 339, quoted in 258 F. Supp. 2d at 376.

The District Court found the Port of Seattle analysis persuasive, and concluded that the inherent vice exclusion is applicable. We agree. As the District Court explained, "[h]ere . . . the insured property, GTE's computer systems, do contain their own 'seeds of destruction'—that is, the two-digit date limitation." 258 F. Supp. 2d at 377.

Furthermore, "GTE is not threatened by any external force; the threat is entirely internal." Id.

On appeal, GTE's principal objection to this conclusion, as elaborated below, is that the threats posed by Y2K were not exclusively internal.

### 3. External Threats

In concluding that GTE's claims were barred by the defective design and inherent vice exclusions, the District Court rejected GTE's argument that its claim cannot be barred by these provisions because it faced risk from Y2K-related events caused by *external* systems. The District Court explained that while "[t]his argument gives the Court pause[,] . . . [t]he record does not reflect that the program was intended to eliminate any external threats, as described by GTE." 258 F. Supp. 2d at 378-79.

In support of its contention that it faced external threats, GTE provided numerous citations to the record in both its brief, see Appellant Br. at 49 & n.12 (citing J.A. at 3881, 3884-96, 3871, 3877, 3840, 4789-90, 5053), and at argument, see Tr. of Argument at 15:21-22 (citing J.A. at 1598-1601, 1764, 1008-09, 1004, 4122-23, 1014). GTE provides minimal explanation for how these citations support its argument. Moreover, upon examination, we are not satisfied that the record supports the conclusion that GTE faced an "external threat" such that the defective design and inherent vice

16

exclusions do not apply.[13]  At best, these citations appear to support the claim that the Y2K problem is particularly complex because of the manner in which GTE's systems interface with third party systems.[14]

We disagree with the suggestion that the Y2K threat is "external" merely because GTE's systems interacted with other systems or read data from outside sources.  Such a conception of external would essentially allow all defective designs and inherent vices to be characterized as external problems.  For example, if a car is defectively designed so that the tires come off when the car is driven at 10 miles per hour, the threat is not external merely because the "external" event of the road contacting the tire caused the tires to fly off.   The road contacting the tire is an entirely predictable event that is inherent to the very function and purpose of the automobile—there is no problem independent of the automotive design.  To take another example, if a dam whose very purpose is to hold water falls apart when the water rises to an entirely predictable level, the rising of the water is not an "external" problem—the problem is that the dam was not properly designed to allow it to perform precisely the function it was intended to perform, the holding of water.

By contrast, if as a consequence of a defective Y2K design the fire retardation system in a building does not function and the building goes up in flames, the fire would be an external event.   The fire represents an independent problem external to the design of the computer system.

---

[13] In fact, some of GTE's citations actually seem to support a contrary conclusion.  For example, GTE cites to a letter responding to a "request for information concerning the steps that GTE has taken to avoid or minimize imminent loss or damage to its insured property." Letter from Raymond J. Alletto, GTE Director of Risk Management, to Ronald H. Davis et. al., Executive General Adjuster McLarens Toplis N.A., Inc. (Oct. 12, 1999), J.A. at 971.  In response to one question, GTE explains, "Some of the costs and expenses associated with the conversion of third party hardware and software have been borne by GTE's suppliers.  We do not believe that the insurers need this information to carry out their analysis because the figures that GTE submitted in its proof of loss do not include any of the costs and expenses that were borne by GTE's suppliers."  J.A. at 1014.

[14] For example, the 1996 Year End Report explains that "the interdependence of systems required to support today's telecommunications business compounds the complexity of the Year 2000 problem [because] [p]lanning of system conversions requires coordination of all underlying hardware, operating systems, third party software layered products and

---

an understanding of all software and data interfaces between systems." J.A. at 1599.

In this case, there was no unpredictable external threat posing a risk to GTE's system.[15] The problem is that the systems were programmed only to recognize the last two digits of the date—the preface remaining a constant "19." The fact, however, that at the turn of the millennium, the preface would now be "20'" rather than "19," thereby requiring four-digit date recognition, was entirely predictable. The annual change in date, like the road impacting the tire and the water level rising, is within the scope of occurrences for which the system was purposely designed. The flaw—that the systems were limited to two-digit date recognition—is entirely endemic to the system. That is, the insured property—GTE's systems—"contain[s] its own seeds of destruction" and is not "threatened by an outside natural force." American Home Assurance Co., 445 F. Supp. at 368.[16]

## B. Exceptions to Exclusions

GTE argues that the District Court failed to consider all relevant policy provisions in finding that GTE's claim fell within the defective design and inherent vice exclusions. In particular,

---

[15] GTE has not attempted to characterize the Y2K problem as a "computer virus." In Port of Seattle, the court rejected a characterization of the Y2K problem as a virus, noting that "[t]he Port's Y2K problem was the result of a deliberate decision by programmers to use a two-digit rather than four-digit year field . . . [and] [t]his feature does not cause the software to be infectious." 48 P.3d at 338. We note in passing that the issue of whether a computer virus constitutes an "external threat" may pose a different question than the one presented in this case.

[16] On appeal, GTE argues that its risk assessment "included risks . . . that systems might fail as a result of corrupt or destroyed data stemming from interactions with computer systems and networks outside of GTE." Appellant Br. at 48. But the record reflects no carefully tailored remediation effort that was limited just to corrupted data entering from outside sources. Nor, as the District Court found, does GTE identify what portion, if any, of its extensive $350 million Y2K program targeted that type of external threat. 258 F. Supp. 2d at 378-79. GTE cannot seek reimbursement for the entire cost of remediating its own defective programs merely because some elements of the program might also serve to mitigate the effect of corrupted data entering from outside sources. GTE was obligated to specifically identify and quantify remediating steps aimed directly at damage from external threats, and therefore potentially covered by the Insurers' policies. GTE did not proceed under such a theory in District Court. Instead it sought reimbursement for its entire program, and attempted to support this claim by alleging that some portion of its program could mitigate unspecified "external" threats.

18

GTE points out that the defective design and inherent vice provisions except from the exclusions "resulting damage" and "ensuing loss or damage."

Specifically, the primary layer policies state that the defective design or specifications exclusion "shall not apply to loss or damage resulting from such defective design or specifications . . . ; however any such resulting damage will be subject to all other exclusions in this Policy." Additionally, inherent vices are not covered "unless loss or damage from a peril insured herein ensues and then this policy shall cover for such ensuing loss or damage." Similarly, the excess layer policies do not insure against faulty design or inherent vice "all unless physical damage not excluded by this Policy results, in which event, this Policy will cover only such resulting damage."

We are not persuaded that the ensuing and resulting loss provisions allow GTE to recover in this case. Several courts considering similar policy provisions have concluded that the cost of correcting design defects cannot be covered under an ensuing loss provision where it was incurred to correct an excluded peril. See Swire Pac. Holdings Inc. v. Zurich Ins. Co., 284 F.3d 1228, 1231 (11th Cir. 2002) (hereinafter Swire II) (citing cases)[17]; see also Montefiore

Med. Center v. Am. Protect. Ins., 226 F. Supp. 2d 470, 479 (S.D.N.Y. 2002) ("An ensuing loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to other property wholly separate from the defective property itself."); Prudential Property & Cas. Ins. Co., 2002 WL 31495830, at *19-20 (D. Or. 2002). That is, "an ensuing loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to *other* property wholly separate from the defective property itself." Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 139 F. Supp. 2d 1374, 1380 (S.D. Fla. 2001) (hereinafter Swire I), certified on appeal 284 F.3d 1228 (11th Cir. 2002) (emphasis in original). Moreover, in the factually analogous Port of Seattle case, the Washington Court of Appeals rejected the contention that even if the Port's Y2K problem was an excluded inherent vice, the Port could recover under the ensuing loss provision. 48 P.3d at 339-40.

An alternative reading of the ensuing and resulting loss provisions would render the policy exclusions virtually meaningless. That is, the "exception to [the] . . . exclusion cannot be construed so broadly that the rule (the exclusion) is swallowed by the exception." Swire I, 139 F. Supp. 2d at 1381. Rather,

[17] In Swire II, the Eleventh Circuit ultimately certified the question of the design defect exclusion's scope to the Florida Supreme Court. See 284 F.3d at 1231, 1234. We do not, however, believe

that certification is necessary in this case. This is not a case in which there is a particular area of the law that we need the state courts to clarify; rather, we find support for our interpretation in the plain meaning of the contract.

the ensuing loss provisions are best read as permitting recovery where a covered peril or damage results from the design defect or inherent vice.[18]  Thus we disagree that

---

[18] Some courts have more narrowly interpreted ensuing loss clauses to apply only "in those rare cases where the reasonable damage expected to be caused by [for example] faulty workmanship leads to another peril that causes damage *beyond that normally expected.*" Prudential, 2002 WL 31495830, at *19 (emphasis added).  The following illustration is helpful:

> [I]f defectively installed roof flashing allows water to leak into the wall cavity, then subsequent damage caused by water, such as dry rot or mold, to the interior of the house is caused by the faulty workmanship and not covered.  If, however, the water migrates into an electrical box and causes an electrical short which in turn causes a fire, then the fire damage is a covered "ensuing loss." [That is,] . . mold, unlike fire, is not an "ensuing loss" due to the lack of any intervening cause other than time beyond the initial water damage.

Id.  We do not reach the issue of whether the "ensuing loss" needs to be the result of

GTE is entitled to coverage because (1) data destruction and (2) business interruption are specifically covered perils.

## 1. Data Destruction

The policies in this case ensure against "all risks of physical loss of or damage to property described herein." "Physical loss or damage" is defined to include "any destruction, distortion or corruption of any computer data, coding, program *except as hereinafter excluded*" (emphasis added).

GTE conceded at argument that "[t]here has to be a physical damage resulting from design defect or inherent vice." Tr. of Argument at 21:22-23.  GTE agrees with the Court, for example, that if, as a consequence of a defective Y2K design, the fire retardation system in a building does not function and the building goes up in flames, "[t]his provision means that the building gets covered, because it is a physical damage to the building, but it doesn't mean that the redesign of the software gets covered." Id. at 5:15-18.  This concession seriously undermines GTE's argument. In this case, GTE is essentially seeking recovery for measures taken to correct its systems, and not for some eventuating physical damage

---

an "intervening cause" or be "beyond that normally expected." Rather, we conclude that GTE has failed to establish any physical damage (whether normally expected or not) "wholly separate from the defective property itself."  Swire I, 139 F. Supp. at 1380.

20

sustained to its property.

GTE argues that because the Y2K problem would inflict physical damage to the system and/or data, it can recover, under the Sue and Labor Provisions discussed more extensively below, for preventive measures taken to mitigate this "ensuing loss." The problem, however, is that GTE has failed to adequately demonstrate that it was threatened by "physical loss" in the form of "destruction, distortion or corruption of any computer data, coding, program," as distinct from the otherwise excluded defective design and inherent vice. That is, GTE has not illustrated that the consequences of failing to correct the two-digit date designation system, causing data to enter the system in an unrecognizable format, are a covered loss.

In response to this Court's inquiry at oral argument, GTE provided record citations on the issue of the "data destruction, distortion and corruption that GTE potentially faced as distinct from the impact on GTE's computers and/or software."[19] GTE's strongest claim appears to be its allegation that absent remediation, "some of [its] . . . systems might have generated incorrect data, thereby corrupting financial records and

[19] Letter from Robert F. Ruyak, Counsel for GTE Corporation, to Marcia M. Waldron, Clerk for the United States Court of Appeals for the Third Circuit (December 15, 2003) (citing J.A. at 992-94, 995-99, 1209-10, 1220-27, 3839-40, 3885).

other databases." Letter from Raymond J. Alletto, GTE Director of Risk Management, to Ronald H. Davis et. al., Executive General Adjuster McLarens Toplis N.A., Inc. (Oct. 12, 1999), J.A. at 992-93. The record, however, does not appear to provide support for this allegation of data corruption. Moreover, at best this establishes that incorrect data may have been generated as a result of problems within GTE's own systems—it does not establish that data destruction or corruption would have ensued "to *other* property wholly separate from the defective property itself." Swire I, 139 F. Supp. 2d at 1380. Here, the plain language of the policies provides coverage for data destruction or corruption "except as hereinafter excluded." As discussed above, the defective design and inherent vice exclusions bar recovery, and a reading of the ensuing loss provisions to provide coverage would essentially read these exclusions out of the policy.

### 2. Business Interruption

GTE also points to the fact that "business interruption" is a specifically covered peril. The primary layer policies provide for coverage for "[l]oss resulting from necessary interruption of business conducted by the Insured and caused by loss, damage, or destruction by *any of the perils covered herein . . . .*" (emphasis added). The "Business Interruption Endorsement" in the excess policies provides coverage for business interruption "resulting from physical loss or damage of the type insured against by this Policy, *to property not otherwise excluded by this Policy.*" (emphasis

added).

As the District Court explained, in this case, in contrast to the factually analogous Port of Seattle case, "GTE has done more than claim testing losses; GTE clearly claims that had it not remediated its computer system in preparation for Y2K, it would have faced separate business interruption losses of a great magnitude." 258 F. Supp. 2d at 380. Viewing the evidence in the light most favorable to GTE, the District Court concluded that GTE faced potential business interruption losses and its remediation efforts were taken to prevent such losses. Nevertheless, the District Court concluded that, pursuant to the terms of the policies, the alleged business interruption losses were not insurable. We agree.

The District Court explained that "[t]he ensuing loss provisions clearly only provide coverage for a *covered* loss ensuing from one of the excluded perils." 258 F. Supp. 2d at 381. Moreover, "[u]nder the plain language of the policies, the business interruption loss must be caused by a covered peril." Id. As a result, because design defects and inherent vices are not perils covered, "the business interruption loss ensuing from a design defect or inherent vice would not be a covered loss." Id. In other words, GTE cannot recover for just any ensuing or resulting business loss—the underlying peril resulting in business interruption must be covered. Returning to the fire example above, business interruption losses ensuing or resulting from any physical damage sustained by a fire would be covered because such physical damage

is a covered peril. However, GTE cannot claim business interruption losses ensuing or resulting from the specifically excluded intrinsic design defect and inherent vice perils. Any other reading of the exclusionary provisions would render the provisions a virtual nullity. GTE could argue, for example, that any upgrade to or correction of a defective system is reimbursable because the ensuing loss from failing to correct the system would result in "business interruption."

In sum, we conclude that even when read in conjunction with the other terms of the policies—the ensuing loss, data destruction, and business interruption provisions—GTE's claim is still barred by the defective design and inherent vice exclusions.

## C. Consideration of After-The-Fact Correspondence

Finally, GTE argues that the District Court, in interpreting the foregoing contract provisions, erred by failing to consider the Insurers' alleged after-the-fact efforts to amend the policies to exclude coverage for Y2K costs. To begin, GTE points out that the Insurers chose to extend GTE's insurance policies through the millennium without including a Y2K exclusion. Moreover, GTE alleges that, in 1998 and the spring of 1999, each Insurer asked GTE to accept a Y2K exclusion.[20] GTE contends that Insurers

---

[20] GTE suggests that its decision to reject such policies resulted in subsequent cancellation of its IRI and Federal policies, as well as Allendale's

should not now be permitted to obtain from the Court contract terms they were unsuccessful in negotiating, and suggests that the efforts to negotiate Y2K exclusions illustrate an awareness on the part of Insurers that under the existing language they were liable for GTE's Y2K remediation measures. We conclude that such alleged after-the-fact correspondence is not properly considered in interpreting this contract, and, moreover, that the correspondence in this case does not appear to support GTE's claim.

New Jersey courts consider the insurer's conduct in determining whether a policy's terms are ambiguous. See Fortunato v. Highlands Ins. Group, 785 A.2d 963, 967 (N.J. Super. Ct. Law Div. 2001) ("The ambiguity of the umbrella policy here is also shown by the conduct of the insurer."). Moreover, courts do not "permi[t] insurance companies to seek refuge in the literal language of their policies when the company's conduct and actions . . . causes [sic] the insured to act or to fail to act based on that conduct." Doto v. Russo, 659 A.2d 1371, 1377 (N.J. 1995). We have already concluded, however, that the terms of the policy unambiguously exclude GTE's claim. Therefore, we find no reason to look to the Insurers' alleged conduct. In addition, GTE has failed to point to conduct by the Insurers that caused GTE to act or fail to act—this is not a case where GTE took some action, to its detriment, in reliance on the Insurers' statements or conduct.

cancellation of selective policies. See Appellant Br. at 21.

In fact, the correspondence in this case does not even appear to support GTE's contention that the Insurers sought to amend the policies to exclude Y2K coverage. In a fax dated June 3, 1998, GTE's Counsel requested that Allendale include clarifying language that it would not add such a Y2K exclusion. The fax provides:

> The letter received was incomplete in GTE and our estimation based on our meeting and Allendale's positive response. We would like the letter to read as follows:
>
>> Allendale will not add any *additional* e x c l u s i o n s, amendments or e n d o r s e m e n t s regarding Year 2000 issues (inability to recognize the correct data including Year 2 0 0 0) t o t h e currently in force GTE/ Allendale policies prior to the expiration of such policies (July 1, 2000).

J.A. at 4156 (emphasis added).

On June 15, 1998, Allendale appears to have transmitted to GTE's insurance broker proposed agreements between Allendale, Affiliated, and GTE. One of the stated objectives of the agreement was to "[e]liminat[e]

uncertainty and achiev[e] mutual agreement as to how the policy responds to Y2K or other similar date or time recognition claims." Letter from Brian J. Krais, Vice President and Operations Manager of Allendale Insurance, to Adam Kagan, J & H Marsh & McLennan (June 15, 1998), J.A. at 4129. The proposed agreement provided that "Afilliated and GTE agree that Affilliated will not endorse onto the existing policy any restriction or clarification to the policy language specifically relating to Y2K." Id. The agreement went on to explain, however, that the parties would "agree that a proper construction and interpretation of the policy is as follows: 1) the policy does not pay for remediation, repair or assessment of any Y2K or similar date or time recognition problem in any electronic data processing equipment and media, whether preventative or remedial . . . ." Id. at 4129-30. However, there is no indication in the record that the parties ever assented to the agreement.

The fact that agreements clarifying the scope of Y2K coverage were discussed, and that GTE may have sought to have Insurers clarify that no "additional exclusions" would be added in no way suggests that GTE believed, much less that Allendale represented, that the policies provided for Y2K coverage. In fact, GTE's attempts to ensure that no "additional exclusions" pertaining to Y2K would be added suggest that GTE anticipated that at least some Y2K measures were not covered under the policy.[21]

## IV. Sue and Labor Provisions

GTE contends that it is entitled to reimbursement under the Sue and Labor Provisions. GTE argues that these provisions require the company to avert certain losses[22] and then obligate the Insurers to reimburse GTE for those

---

[21] At oral argument, GTE's counsel contended that there is a "disputed fact" as to whether GTE or the Insurers sought clarification on whether the policy covered Y2K measures, indicating "we haven't had discovery on that issue yet." Tr. of Argument at 18:7-10. Even assuming that the Insurers sought the clarification, GTE's argument still fails. The fact that Insurers may have sought clarification and after negotiations agreed not to add additional Y2K exclusions does not support GTE's claim that the Insurers represented that Y2K measures were covered.

[22] The language of the Preservation and Protection of Property Clause, in the excess layer policies, does not appear to explicitly obligate GTE to take action. Rather, it merely provides that "the expenses incurred by the Insured in taking reasonable and necessary actions for the temporary protection and preservation of property . . . shall be added to the total physical loss or damage otherwise recoverable . . . ." Whether or not GTE was obligated to take such measures, however, is ultimately immaterial to our holding.

expenses. We decided in Part III that, because of the policies' exclusions, GTE's actions were not aimed at averting a covered loss. Therefore, the only remaining question is whether the Sue and Labor Provisions provide an independent basis for recovery. They do not.

The Sue and Labor Provisions do not save GTE's claims from the policy exclusions. Rather, as the District Court explained,

> [T]he purpose of the sue and labor clause is to reimburse the insured for costs incurred to satisfy the insured's duty to the insurer. If the insured acts to prevent a loss that is not covered by the policy, there is no duty or benefit to insurer; "[t]he obligation only exists when the action taken is to prevent a loss for which the underwriter would be liable."

258 F. Supp. 2d at 373 (quoting Port of Seattle, 48 P.3d at 340). In Port of Seattle, the Washington Court of Appeals held that expenses incurred to prevent Y2K losses were not covered under the sue and labor clause because the Port sought to prevent a loss that would occur after the policies expired. 48 P.3d at 340. While Port of Seattle is arguably distinguishable on some grounds and is certainly not binding precedent, the underlying rationale of the court's decision is persuasive. The purpose of a sue and labor clause is to encourage the prevention

of loss that is the subject of the policy; that is, the clause is designed to allow reimbursement for measures taken by the insured to mitigate damages in order to reduce the insurer's obligation under the policy. See Swire I, 139 F. Supp. 2d at 1383. While there is some dispute as to whether the covered loss has to occur to invoke coverage, see Swire II, 284 F.3d at 1232 (citing cases), it seems undisputed that the actions must at least be aimed at a covered loss. An alternative view, construing the Sue and Labor Provisions as separate insuring agreements, would read the defective design and inherent vice exclusions out of the policy.

Thus, the Sue and Labor Provisions do not provide an independent basis for GTE's recovery. Such an interpretation of the Sue and Labor Provisions is necessary to avoid rendering the exclusionary provisions meaningless; an alternative interpretation would permit GTE to recover for improvements and measures taken to address a host of uninsured risks.

*****

For the foregoing reasons, we will affirm the District Court's grant of summary judgment.